756 So.2d 90 (2000)
M.W., a child, Petitioner,
v.
Arlonia DAVIS, Director of Adolescent Programs, Lock Towns Community Mental Health Center, Inc., and Florida Department of Children and Family Services, Respondents.
No. SC95443.
Supreme Court of Florida.
May 4, 2000.
*91 Carolyn S. Salisbury, Bernard P. Perlmutter and K. David Daniel of the University of Miami School of Law, Children & Youth Law Clinic, Coral Gables, Florida; and Annemarie H. Block, Attorney for Mother of Petitioner, M.W., Miami, Florida, for Petitioner.
Linda Ann Wells and Charles M. Auslander of the Department of Children & Families; and Harold E. Patricoff and Michael V. Herskowitz of Shutts & Bowen LLP, Miami, Florida, for Respondents.
Nancy Schleifer, Miami, Florida, for The Guardian ad Litem Program, Amicus Curiae.
Michelle Hankey, James Walsh, and John Walsh of the Legal Aid Society of Palm Beach County, Inc., West Palm Beach, Florida, for The Juvenile Advocacy Project Of The Legal Aid Society Of Palm Beach County, Inc., Amicus Curiae.
Christina A. Zawisza and John M. Ratliff of Children First Project, Nova Southeastern University, Fort Lauderdale, Florida; and Barbara W. Green of ACLU of Florida, Coral Gables, Florida, for Children's *92 First Project, Shepard Broad Law Center, Nova Southeastern University; National Association of Counsel for Children; The Advocacy Center Persons with Disabilities, Inc.; and American Civil Liberties Union Foundation of Florida, Inc., Amici Curiae.
PARIENTE, J.
We have for review M.W. v. Davis, 722 So.2d 966 (Fla. 4th DCA 1999), a decision of the Fourth District Court of Appeal that certified the following question to be one of great public importance:
IS A HEARING WHICH COMPLIES WITH THE REQUIREMENTS OF SECTIONS 39.407(4) AND 394.467(1), FLORIDA STATUTES, NECESSARY WHEN A COURT ORDERS THAT A CHILD BE PLACED IN A RESIDENTIAL FACILITY FOR MENTAL HEALTH TREATMENT, WHERE THE CHILD HAS BEEN COMMITTED TO THE LEGAL CUSTODY OF THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES, AND THE DEPARTMENT IS SEEKING RESIDENTIAL TREATMENT?
M.W. v. Davis, 729 So.2d 481 (Fla. 4th DCA 1999). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
For the reasons expressed in this opinion, we conclude that neither the statutory framework of Chapter 39 nor the Constitution requires an evidentiary hearing that complies with the substantive and procedural requirements of section 394.467(1), Florida Statutes (1997), part of the Baker Act,[1] prior to a court ordering that a dependent child in the temporary legal custody of the Department of Children and Families ("the Department") be placed in a residential mental health facility. Accordingly, we answer the certified question in the negative.

FACTS
M.W., the petitioner in this case, is a sixteen-year-old male adolescent from Dade County. M.W. was removed from his mother's custody at the age of six due to allegations of abuse and neglect. Although M.W. was adjudicated dependent and placed in the temporary legal custody of the Department, his mother's parental rights have not been terminated.[2] The case plan goal for M.W. has been reunification with his eight siblings and his mother. During the ten years M.W. has been in the protective custody of the State of Florida, M.W. has been placed in several different settings, including foster homes, group homes and his mother's home. When he was placed by the Department in a custodial setting outside of his mother's home, M.W. frequently ran away to return to his mother's home. He has also been hospitalized for evaluation and treatment of mental health problems. At all times material to the proceedings in this case, M.W. has had the benefit of court-appointed counsel.[3]
The events leading up to the issue addressed by the certified question arose from disagreement among health care professionals over the appropriate placement for M.W. In May of 1998, as a result of behavioral and psychological problems, M.W., who was fifteen at the time, was admitted to the psychiatric unit at Palmetto General Hospital for examination and *93 treatment.[4] M.W. remained hospitalized at Palmetto General from May 14, 1998, to June 16, 1998. The two mental health professionals who evaluated M.W. at Palmetto General disagreed as to the type of placement that was appropriate for M.W. Dr. Gerald Olivera, a psychiatrist, recommended "a residential placement emphasizing self-responsibility, self-identity and independent living skills," in addition to medication and therapy with a psychiatrist. In contrast, Dr. Cecilia Deidan, a psychologist, recommended that M.W. be placed in a foster care home with an "accessible and available" foster mother and that M.W. be given therapy and medication.[5]
The Department then sought to place M.W. in a residential facility. M.W. contested this placement and, through his attorney, filed an emergency motion for an independent expert examination to determine whether residential psychiatric treatment was needed. The dependency court held a hearing on this motion on June 18, 1998. At this hearing, the Department agreed with M.W.'s request that the court schedule an evidentiary hearing to determine the appropriate placement for M.W. The dependency court judge granted the motion for the independent expert examination[6] but deferred ruling on the request for an evidentiary hearing until after she received the results of the independent expert's evaluation.[7]
At this same hearing, M.W.'s counsel also advised the dependency court that M.W. had been released from Palmetto General and placed in foster care but that he had not received his prescribed psychotropic medications for two days. At a hearing held eleven days later on June 29, 1998, M.W.'s counsel advised the court that M.W. was still not receiving his medications and as a result had destabilized. M.W. thus requested that he be placed once again in the psychiatric unit at Palmetto General in order to receive his medications and stabilize. In accordance with M.W.'s request, the court ordered that M.W. be returned to Palmetto General.
While M.W. was in Palmetto General, Dr. Stanley Doyne, a clinical psychologist at Jackson Memorial Medical Center of the University of Miami, conducted a comprehensive assessment of M.W. pursuant to the court's order for an independent examination. In his written report dated July 20, 1998, Dr. Doyne recommended *94 that M.W. be given family and individual therapy, psychotropic medications, and that he be placed in therapeutic foster care. Dr. Olivera, who had previously evaluated M.W., conducted an additional evaluation at Palmetto General on July 17, 1998, and recommended that M.W. be placed into therapeutic foster care with one other child and a strong, caring African-American foster mother. Dr. Olivera also recommended that M.W. receive therapy and that he be given a specific plan to reach his goal of reunification with his mother.
On July 30, 1998, M.W. filed an emergency motion to compel the Department to pick up M.W. from Palmetto General and put him in an appropriate placement. According to M.W.'s allegations, Palmetto General attempted to discharge him on July 13, 1998, but the Department had no other placements available.[8]
Apparently, M.W.'s hospitalization dragged on because of the lack of available placements. Then, on August 10, 1998, an incident occurred in which M.W. became physically and verbally aggressive towards one of his peers at Palmetto General. As a result of this incident, Dr. Olivera changed his most recent recommendation from therapeutic foster care placement to a recommendation that it was essential to place M.W. in a residential psychiatric treatment facility. In Dr. Olivera's opinion, M.W. needed a highly structured environment. Dr. Olivera also expressed the opinion that M.W. constituted a danger to himself and to others due to his inability to appropriately express his anger and regain control.
On August 12, 1998, a hearing was held on M.W.'s previously filed motion to compel the Department to find him an appropriate placement. The dependency court judge ordered that M.W. be removed from Palmetto General and placed in a specialized therapeutic foster respite home, pending a search by the Department for a more appropriate home and a comprehensive assessment of his needs.
Dr. Barton L. Jones, a psychologist selected by the Department, then conducted a comprehensive psychological assessment and recommended placement in a "supportive, but locked residential environment wherein [M.W.] will be able to develop relationships with others and can participate in family therapy" and receive psychological and psychiatric treatment. Dr. Jones stated that M.W. "did not appear to be at risk for suicidal attempts or self-injurious behaviors but he is at risk for running away and the dangers associated with this."
M.W.'s case came back before the dependency court judge at a status hearing on September 23, 1998.[9] By this time, the Family Services Planning Team and the Case Review Committee[10] had met and both recommended residential placement for M.W.[11] Due to the conflicting recommendations from the psychologists and *95 psychiatrists that had evaluated M.W., both the Department and M.W.'s attorney once again asked the court to schedule an evidentiary hearing to resolve the contested issue of M.W.'s placement. The Department advocated placement in a residential facility, while M.W. requested placement in a therapeutic foster care home. The dependency judge recognized the need for an evidentiary hearing, but explained that she had no time available for a hearing until November 9, 1998. Despite the protestations of M.W.'s counsel that this date was six weeks in the future and no commitment should occur without an evidentiary hearing first, the judge ordered that M.W. be placed in Lock Towns Adolescent Care Program, a locked mental health treatment facility in Broward County, "temporarily, until we have an evidentiary hearing."[12] The judge expressed her view that Lock Towns was the most "appropriate facility" considering M.W.'s prior failed placements and recent hospitalization.
In response, M.W. filed a petition for writ of habeas corpus in the Fourth District.[13] M.W. argued that the dependency judge's order constituted an involuntary commitment to a mental health facility requiring an evidentiary hearing under section 39.407(4), Florida Statutes (Supp. 1998), and the Baker Act, specifically sections 394.463 and 394.467, Florida Statutes (1997). In its original opinion, the Fourth District granted the writ of habeas corpus on the grounds that section 39.407(4) requires the Department to comply with the procedures required by sections 394.463 and 394.467 of the Baker Act before placing a dependent child in psychiatric residential treatment. See M.W. v. Davis, 23 Fla. L. Weekly D2419 (Fla. 4th DCA Oct.27, 1998), withdrawn on rehearing, 722 So.2d 966 (1999). However, the Fourth District thereafter granted the Department's motion for rehearing. See M.W., 722 So.2d at 969.
In its opinion on rehearing, the Fourth District reasoned that because M.W. is a child who has been adjudicated dependent and committed to the temporary legal custody of the Department and because the Department is seeking residential treatment, a Baker Act hearing is not required by section 39.407(4) before placing M.W. in a residential psychiatric treatment facility. See M.W., 722 So.2d at 968-69. As the temporary legal custodian of the dependent child, the Department has the statutory authority to obtain "ordinary" medical treatment pursuant to section 39.01(70), Florida Statutes (Supp.1998), but that authority may be enlarged by a court order. See M.W., 722 So.2d at 969. Although the commitment of a child to a locked, residential psychiatric facility is not "ordinary" medical care, the Fourth District concluded that the court can authorize this treatment by court order, "but that approval is pursuant to Chapter 39, not the Baker Act." Id.
The Fourth District reasoned that although "Chapter 39 does not specifically explain, like the Baker Act does, what must be demonstrated in order to obtain court approval for this treatment," procedures in chapter 39 provided for ongoing judicial review. Id. In rejecting M.W.'s argument that his placement in Lock Towns was void or illegal[14] because no *96 testimony was taken at the last hearing, the Fourth District pointed to the fact that "there had been a number of prior hearings involving M.W.'s mental problems." Id. Further, the court had considered "several psychiatric and psychological reports" and M.W.'s placement had been "considered by a Family Services Planning Team and a Case Review Committee." Id. The Fourth District concluded that it was "satisfied that the court did not abuse its discretion in concluding that this nonordinary residential placement was `consistent with the child's best interests and special needs.'" M.W., 722 So.2d at 969 (quoting section 39.701(7)(g), Florida Statutes (Supp.1998)). Accordingly, the Fourth District denied M.W.'s petition for a writ of habeas corpus. See id.

ANALYSIS
The question certified by the Fourth District requires us to examine the statutory framework of Chapter 39 to determine whether the substantive and procedural requirements of the Baker Act have been expressly incorporated into the laws regulating dependency proceedings.[15] All parties in this case agree that section 39.407(4) requires dependency courts to comply with the procedures outlined in the Baker Act prior to placing a child who has been taken into emergency shelter into a residential mental health treatment facility. In addition, all parties agree that a hearing before a judge is required before a child who has been adjudicated dependent may be placed by the Department into a residential mental health treatment facility against the child's wishes. At issue, however, is whether that hearing must comply with the procedural requirements of the Baker Act, the factors to be considered by the dependency court, and whether evidence should be allowed.[16]

*97 A. DUE PROCESS
Because M.W. asserts both a constitutional and a statutory basis for an evidentiary hearing, we first evaluate the nature and extent of the constitutional rights involved.[17] The Fourteenth Amendment of the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Article I, section 9 of the Florida Constitution provides a similar guarantee that "[n]o person shall be deprived of life, liberty or property without due process of law."
The Due Process clauses of the United States and Florida Constitutions encompass both substantive and procedural due process. See, e.g., Department of Law Enforcement v. Real Property, 588 So.2d 957, 960 (Fla.1991). As we have previously explained, "[s]ubstantive due process under the Florida Constitution protects the full panoply of individual rights from unwarranted encroachment by the government." Id. Likewise, we have made clear that the purpose of procedural due process is to "serve[] as a vehicle to ensure fair treatment through the proper administration of justice where substantive rights are at issue." Id. "[T]he extent of procedural due process protections varies with the character of the interest and nature of the proceeding involved." In re D.B., 385 So.2d 83, 89 (Fla.1980). Although in D.B. we discussed the constitutional rights of parents whose parental rights the Department sought to terminate, we did not discuss the nature and extent of the child's constitutional rights in a dependency proceeding except to find that there was "no constitutional right to counsel." Id. at 91.[18]
In Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), the United States Supreme Court explored the nature and extent of a child's rights when the child is committed to a state mental hospital. 442 U.S. at 606-07, 99 S.Ct. 2493. The United States Supreme Court stated that "[i]t is not disputed that a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment and that the state's involvement in the commitment decision constitutes state action under the Fourteenth Amendment." Parham, 442 U.S. at 600, 99 S.Ct. 2493 (emphasis supplied). Accordingly, the Court "assume[d] that a child has a protectable interest not only in being free of unnecessary bodily restraints but also in not being labeled erroneously by some persons because of an improper decision by the state hospital superintendent." Id. at 601, 99 S.Ct. 2493.
Under the Georgia statute challenged in Parham, a parent or guardian could admit a child for "observation and diagnosis." Id. at 591, 99 S.Ct. 2493. The statute, governing voluntary admissions, further provided that if the superintendent of the hospital found "evidence of mental illness" and that the child was "suitable for treatment" in the hospital, the child could be admitted "for such period and under such conditions as may be authorized by law." Id. at 590-91, 99 S.Ct. 2493. Although one of the plaintiffs in Parham had been voluntarily admitted to the mental hospital by his parents, the named plaintiff, J.R., was "declared a neglected child" and removed from his parents' care by the county. As a ward of the State of Georgia, J.R. had been admitted to the mental institution by *98 the Georgia Department of Family and Children Services. See id.
The Supreme Court first discussed whether the procedure used by the State of Georgia violated due process when the child's parent admitted the child to the state mental hospital. See Parham, 442 U.S. at 589-617, 99 S.Ct. 2493. The Court determined that
our precedents permit the parents to retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply. We also conclude, however, that the child's rights and the nature of the commitment decision are such that parents cannot always have absolute and unreviewable discretion to decide whether to have a child institutionalized. They, of course, retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment.
Id. at 604, 99 S.Ct. 2493. In addition, the Court recognized that the State has "a significant interest in confining the use of its costly mental health facilities to cases of genuine need." The opinion in Parham also acknowledged the State's interests in "not imposing unnecessary procedural obstacles that may discourage the mentally ill or their families from seeking needed psychiatric assistance," and "a genuine interest in allocating priority to the diagnosis and treatment of patients as soon as they are admitted to a hospital rather than to time-consuming procedural minuets before the admission." Id. at 604-05, 99 S.Ct. 2493.
Answering the question "what process protects adequately the child's constitutional rights," the Court concluded that
the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a "neutral factfinder" to determine whether the "statutory requirements for admission are satisfied." That inquiry must carefully probe the child's background using all available sources, including, but not limited to, parents, schools, and other social agencies. Of course, the review must also include an interview with the child. It is necessary that the decisionmaker have the authority to refuse to admit any child who does not satisfy the medical standards for admission. Finally, it is necessary that the child's continuing need for commitment be reviewed periodically by a similarly independent procedure.

. . . .
Due process has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer.
Id. at 606-07, 99 S.Ct. 2493 (emphasis supplied) (citations omitted) (footnote omitted).
The Supreme Court next considered what process is due when the child is a ward of the state. See id. at 617-21, 99 S.Ct. 2493. The Court recognized that when a child is in the custody of the state due to the parent's abuse or neglect, the state has a statutory duty to consider the best interests of the child with regard to commitment. See id. at 618-19, 99 S.Ct. 2493. In addition, in this situation, the extensive written records usually compiled when a child has been adjudicated dependent are typically independently reviewed prior to the commitment. See id. Although the majority recognized that "what process is due varies somewhat when the state, rather than a natural parent, makes the request for commitment," the Court concluded that "the differences in the two situations do not justify requiring different procedures at the time of the child's initial admission to the hospital." Parham, 442 U.S. at 617-18, 99 S.Ct. 2493 *99 (emphasis supplied).[19] However, the Court suggested that "[i]t is possible that the procedures required in reviewing a ward's need for continuing care should be different from those used to review the need of a child with natural parents." Id. at 619, 99 S.Ct. 2493.[20]
Thus, the United States Supreme Court in Parham set forth three minimum due process requirements that must be provided when a child is committed: (1) an inquiry by a neutral factfinder, which is not required to be in the form of a judicial inquiry; (2) the inquiry must probe the child's background using all available resources; and (3) there must be periodic review by a neutral factfinder. Id. at 606, 99 S.Ct. 2493. These minimum standards apply whether the child has been admitted by the state as the guardian of its ward or by a natural parent. See id. at 618-19, 99 S.Ct. 2493.[21]
Applying these constitutional principles to the present case, we note that the dependency judge's decision to place M.W. in Lock Towns was not made in a vacuum. The judge was already familiar with M.W. and had reviewed his case at several hearings in the months preceding his placement in Lock Towns. Before ordering the placement in Lock Towns, the dependency judge considered the recommendation of the citizen review panel and two psychological and psychiatric reports, which concurred that it was necessary to place M.W. in a locked residential facility. The judge expressed her view that this was the most "appropriate facility" considering the child's prior failed placements and recent hospitalization. Although the dependency judge did not hold an evidentiary hearing before placing M.W. in Lock Towns, she did recognize the need for an evidentiary hearing and scheduled one for a date six weeks in the future. Accordingly, the procedure followed in this case prior to ordering that M.W. be placed in Lock Towns satisfied minimum constitutional due process requirements as set forth in Parham.[22]

*100 B. STATUTORY FRAMEWORK
As an alternative to his constitutional argument, M.W. contends that the Florida Legislature has provided children with greater rights than the minimum procedures required by the Constitution.[23] In particular, M.W. argues that pursuant to section 39.407(4), the court must expressly follow the procedures and standards set forth in the Baker Act before any dependent child may be placed in a residential mental health treatment facility. In contrast, the Department argues that the Baker Act procedure is only to be followed for those children who have been taken into custody but have not yet been adjudicated dependent.
These arguments require us to interpret the applicable statutes related to dependency proceedings. When construing statutes, we have explained that "legislative intent is the polestar that guides our inquiry." McLaughlin v. State, 721 So.2d 1170, 1172 (Fla.1998); see St. Petersburg Bank & Trust Co. v. Hamm, 414 So.2d 1071, 1073 (Fla.1982).
M.W. relies specifically upon section 39.407(4) for his position that the dependency court judge lacked the authority to commit him to a residential facility without following the procedural and substantive provisions of the Baker Act. At the time of the hearing in this case, the relevant provisions of section 39.407 governing the manner in which medical and psychiatric care can be obtained by the Department provided in pertinent part:
39.407 Medical, psychiatric, and psychological examination and treatment of child; physical or mental examination of parent or person requesting custody of child.
(1) When any child is taken into custody and is to be detained in shelter care, the department is authorized to have a medical screening performed on the child without authorization from the court and without consent from a parent or legal custodian. Such medical screening shall be performed by a licensed health care professional and shall be to examine the child for injury, illness, and communicable diseases and to determine the need for immunization. The department shall by rule establish the invasiveness of the medical procedures authorized to be performed under this subsection. In no case does this subsection authorize the department to consent to medical treatment for such children.
(2) When the department has performed the medical screening authorized by subsection (1), or when it is otherwise determined by a licensed health care professional that a child who is in the custody of the department, but who has not been committed to the department, is in need of medical treatment, including the need for immunization, consent for medical treatment shall be obtained in the following manner:

(a)1. Consent to medical treatment shall be obtained from a parent or legal custodian of the child; or
2. A court order for such treatment shall be obtained.
. . . .

*101 In no case shall the department consent to sterilization, abortion, or termination of life support.
(3) A judge may order a child in the physical custody of the department ... to be evaluated by a psychiatrist or a psychologist.... If it is necessary to place a child in a residential facility for such evaluation, then the criteria and procedure established in s. 394.463(2) or chapter 393[[24]] shall be used, whichever is applicable....
(4) A judge may order a child in the physical custody of the department to be treated by a licensed health care professional based on evidence that the child should receive treatment. The judge may also order such child to receive mental health or retardation services from a psychiatrist, psychologist, or other appropriate service provider. If it is necessary to place the child in a residential facility for such services, then the procedures and criteria established in s. 394.467 [the Baker Act] or chapter 393 shall be used, whichever is applicable....
. . . .
(12) Nothing in this section alters the authority of the department to consent to medical treatment for a dependent child when the child has been committed to the department and the department has become the legal custodian of the child.

§ 39.407, Fla. Stat. (Supp.1998) (emphasis supplied).
M.W. contends that the plain language of section 39.407(4) demonstrates the Legislature's intent to incorporate the procedures of the Baker Act, requiring that these procedures be followed before a court can order that a dependent child be placed into a residential psychiatric treatment facility. "When the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." McLaughlin, 721 So.2d at 1172 (quoting Holly v. Auld, 450 So.2d 217, 219 (Fla.1984)). However, we find that this statute is ambiguous as to whether the Legislature intended for the Baker Act procedures to apply only to children who have been placed in emergency shelter or whether the procedures also apply to those children who have been adjudicated dependent. See Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 455 (Fla.1992) ("Ambiguity suggests that reasonable persons can find different meanings in the same language.").
A basic principle of statutory construction requires that "all parts of a statute must be read together in order to achieve a consistent whole. Where possible, courts must give effect to all statutory provisions and construe related statutory provisions in harmony with one another." Id. (citations omitted); see C.S. v. S.H., 671 So.2d 260, 269 (Fla. 4th DCA 1996) (reading various sections of chapter 39 to determine legislative intent). Thus, to determine whether the Legislature intended the substantive and procedural provisions of the Baker Act to be followed when residential treatment is sought for a child who has been already adjudicated dependent, we first examine the statutory provisions set forth in Chapter 39 that govern the steps that are followed for children who are removed from the home as a result of allegations of abandonment, abuse or neglect.
The dependency court's involvement with a child typically begins when the Department files a petition to place the child in emergency shelter. If the Department removes the child from the home, the petition *102 must be filed within 24 hours after the child is taken into custody. See §§ 39.401(3), 39.402(8)(a), Fla. Stat. (Supp. 1998). The dependency court may place a child who is "taken into custody" in a shelter if the court makes a factual finding that it is necessary to remove the child from the parent's home because: (1) the child has been abused, neglected, or abandoned or is in imminent danger of suffering an injury or illness from abuse, neglect or abandonment; or (2) child has no parent or responsible adult relative to provide care; or (3) the parent or legal custodian has materially violated a condition of placement imposed by the dependency court. See § 39.402(1)-(2), Fla. Stat. (Supp.1998). A child may not be retained in emergency shelter for more than sixty days without an adjudication of dependency. See § 39.402(13).
At the adjudicatory hearing, the dependency court must determine whether the Department has established by a preponderance of the evidence that the child is dependent-for example, abandoned, abused, or neglected, or is at substantial risk of imminent harm from abandonment, abuse, or neglect. See §§ 39.01(14); 39.507(1)(b), Fla. Stat. (Supp.1998).[25] Chapter 39 vests the dependency court with broad powers at the disposition hearing. These alternatives include requiring the parent and child to participate in services or treatment, placing the child in the protective supervision of the Department while the child remains in the home, placing the child in the temporary or longterm legal custody of an adult relative, and placing the child in long-term out-of-home care or in an independent living arrangement. See § 39.508(9), Fla. Stat. (Supp. 1998).
Once a child has been adjudicated dependent, the dependency court also has the power to place the child in the "temporary legal custody" of the Department, as authorized by section 39.508(9)(a)7. In this case, M.W. had previously been placed in the "temporary legal custody" of the Department.
Chapter 39 defines "temporary legal custody" as "the relationship that a juvenile court creates between a child and an adult relative of the child, legal custodian, or caregiver approved by the court, or other person until a more permanent arrangement is ordered." § 39.01(70). As temporary legal custodian, the Department then is conferred certain rights and responsibilities that are particularly significant to our statutory interpretation:
Temporary legal custody confers upon the custodian the right to have temporary physical custody of the child and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, and education, and ordinary medical, dental, psychiatric, and psychological care, unless these rights and duties are otherwise enlarged or limited by the court order establishing the temporary legal custody relationship.
Id. (emphasis supplied). Under this section of Chapter 39, once a child is adjudicated dependent and committed to the temporary legal custody of the Department, the Department has the authority to consent to "ordinary" medical and psychiatric care. See id.; M.W., 722 So.2d at 969; see also § 39.508(9)(a)7.
In contrast, section 39.407(4), which M.W. asserts applies to him, requires court approval before the Department may obtain treatment "by a licensed health care professional" or "mental health or retardation services from a psychiatrist, psychologist or other appropriate service provider." A construction that section 39.407(4) applies to children who have been adjudicated dependent and placed in the temporary *103 legal custody of the Department would expressly conflict with the Department's specific authority granted by section 39.01(70) to obtain ordinary psychological or psychiatric care for dependent children in its temporary legal custody. In fact, section 39.407(12) provides that nothing in section 39.407 is intended to "alter[] the authority of the department to consent to medical treatment for a dependent child when the child has been committed to the department and the department has become the legal custodian of the child."
In addition to conflicting with another express provision of Chapter 39, the actual language used in section 39.407(4) provides support for our interpretation. Chapter 39 does not define "in the physical custody," which is the relevant term used by section 39.407(4). However, the term "taken into custody" is defined as "the status of a child immediately when temporary physical control over the child is attained by a person authorized by law, pending the child's release or placement." § 39.01(69) (emphasis supplied). This language suggests that the procedures in section 39.407(4) are limited to those children in emergency shelter, but not yet adjudicated dependent and placed in the Department's temporary legal custody.[26]
An interpretation that the Legislature did not intend the incorporation of the Baker Act in section 39.407(4) to apply to those children who have been adjudicated dependent and placed in the temporary legal custody of the Department is consistent with other subsections of section 39.407, which apply to children who have not yet been adjudicated dependent and placed in the temporary legal custody of the Department. See, e.g., Golf Channel v. Jenkins, 752 So.2d 561 (Fla.2000) (reading related statutory provisions together in order to determine legislative intent). For example, section 39.407(1) provides that the Department may obtain a medical screening of all children who have been taken into emergency shelter, but expressly provides that this subsection does not provide authority for the Department to consent to medical treatment on behalf of children in shelter care. Section 39.407(2) provides a procedure for the Department to obtain consent for medical care for those children who are "in the custody of the department, but who ha[ve] not been committed to the department." This subsection clearly applies to those children who have been placed in emergency shelter, but not to those children who have been adjudicated dependent and placed in the Department's temporary legal custody. *104 Because section 39.01(70) provides that the Department has the authority to consent to ordinary medical treatment for those children who have been adjudicated dependent and placed in its custody, it is logical that the procedure spelled out in section 39.407(2) is inapplicable to children committed to the temporary legal custody of the Department.
Lastly, section 39.407(3), the subsection immediately preceding the subsection relied on by M.W., requires court approval before the Department may obtain an examination for the child by a "licensed health care professional," or an evaluation by a psychiatrist or psychologist. Once again, interpreting this subsection as applicable to children in the Department's legal custody would conflict with the authority granted by section 39.01(70) to obtain "ordinary" medical and psychological care. These subsections within section 39.407 are consistent with an overall legislative intent that the procedures set forth in section 39.407 do not apply to children who have been declared dependent and placed in the temporary legal custody of the Department.
When construing the intended scope of section 39.407(4), it is also important to read this provision in context with the other sections of Chapter 39 in order to harmonize it with interlocking statutes. See C.S., 671 So.2d at 268. The structure of Chapter 39 provides for an ongoing proceeding in which the dependency court supervises the placement of dependent children through the approval of the case plan and periodic judicial review. See M.W., 722 So.2d at 969; see also §§ 39.508, .601, .701, Fla. Stat. (Supp. 1998). As pointed out by the Fourth District, unlike a Baker Act proceeding in which the judge may have had no prior involvement with the child, "the juvenile [dependency] court judge has an ongoing relationship with the child" in dependency proceedings. M.W., 722 So.2d at 969.
The case plan, which must be approved by the dependency court,[27] must include a "description of the type of home or institution in which the child is to be placed" as well as a discussion of "the safety and appropriateness of the child's placement, which placement is intended to be safe, the least restrictive and most family-like setting available consistent with the best interest and special needs of the child, and in as close proximity as possible to the child's home." § 39.601(3)(b), (e) (emphasis supplied).[28] In addition to requiring a case plan that is approved by the dependency court, chapter 39 charges the dependency court with the responsibility of periodically reviewing the child's status. See § 39.701, Fla. Stat. (Supp.1998).[29] At each review, the court or citizen review panel must "seek to determine" the "appropriateness of the child's current placement, including whether the child is in a setting which is as family-like and as close to the parent's *105 home as possible, consistent with the child's best interests and special needs." § 39.701(7)(g).
As the Fourth District reasoned, this ongoing involvement with the dependent child's case that is contemplated by the statutory requirement that the court approve the case plan and periodically review the case indicates a legislative intent not to incorporate the Baker Act proceeding. See M.W., 722 So.2d at 969. Considering the statutory framework of Chapter 39 and the ongoing judicial review once a child is adjudicated dependent, it is reasonable to conclude that the Legislature would require different procedures to apply when the Department takes the extraordinary step of requesting the court to order residential mental health treatment for a child who is not yet in its temporary legal custody versus a child who has been adjudicated dependent and placed in the Department's legal custody.
Lastly, we have also considered whether the specific provisions of the Baker Act are compatible with the provisions of Chapter 39. Accord C.S., 671 So.2d at 271 (adopting reasonable construction of chapter 39 that "comports with common sense as well as public policy"). In contrast to the ongoing judicial supervision of dependency court proceedings, the proceeding contemplated by the Baker Act is an entirely new proceeding separate from the dependency proceeding, where the treatment facility brings the petition, the public defender represents the patient, and the state attorney represents the State as the real party in interest. See § 394.467(3)-(4), (6)(a)1. Within five days after the petition is filed along with the recommendations of a psychiatrist and a second psychologist or psychiatrist, the court must hold a hearing and the treatment facility must prove by "clear and convincing evidence" that the patient is mentally ill and either cannot care for himself or is likely to "inflict serous bodily harm." See § 394.467(1), (6).
Both the Department and the Guardian Ad Litem Program of the Eleventh Judicial Circuit amicus have expressed concern that the Department should not be limited to placing a dependent child in a residential psychiatric treatment only in those situations where the child is so disturbed that the child meets the criteria of being manifestly incapable of surviving alone or dangerous.[30] Further, as expressed by the amicus briefs filed by the Guardian Ad Litem Program of the Eleventh Judicial Circuit and the Palm Beach County Legal Aid Society, proper procedures exercised by the dependency court before placing a dependent child into a residential psychiatric treatment facility will better assure the child's safety and mental health than the procedures required by section 394.467(1). These positions appears to be consistent with the statutory framework of Chapter 39 and the overall legislative intent in enacting this chapter. Accordingly, reading the entire text of section 39.407 together with sections 39.01(69) and (70), 39.508, 39.601 and 39.701, we find that the Legislature did not intend for the Baker Act to apply to those children who have been adjudicated dependent and placed in the *106 temporary legal custody of the Department.[31]

C. APPLICABLE PROCEDURES
Having concluded that the Legislature did not intend to require a hearing in conformance with the Baker Act, we are left with the thornier question of what procedures should apply before a court orders a dependent child placed in a residential psychiatric treatment facility against the child's wishes. As expressed by the Legislature, one of the purposes of Chapter 39 is the intent:
To provide judicial and other procedures to assure due process through which children, parents, guardians and other interested parties are assured fair hearings by a respectful and respected court or other tribunal and the recognition, protection and enforcement of their constitutional and other legal rights....
§ 39.001(1)(l). The Department assures us that the laws regulating dependency proceedings in Chapter 39 provide ample protections for children.[32] Because placing a child in a locked mental health facility is not "ordinary" care, see M.W., 722 So.2d at 969, the Department agrees that court approval is necessary before such treatment can be administered to a dependent child. However, despite the myriad of reviews by a variety of individuals involved, no statute or rule specifically sets forth the procedures that the Department should follow in order to obtain court approval of residential treatment, which it concedes is required. We are thus concerned that, although there are various procedures in Chapter 39, that could be construed to require a hearing before a trial court orders a commitment, neither Chapter 39 nor our own procedural rules adequately address whether an attorney for the child *107 should be appointed before a commitment to a residential facility takes place,[33] what type of hearing is required, what standard of proof should apply and whether the child should have the right to put on evidence before the court orders a placement in a residential psychiatric facility.[34]
Although the parties agree that the decision to place a dependent child in a residential psychiatric treatment facility must be included in the case plan, which must be approved by the dependency court, they disagree as to what procedures the court must follow before allowing an amendment to the case plan and when the amendment must take place. Thus, while the Department agrees that an amendment to the case plan would be required to place M.W. in a residential facility, it also argues that the evidentiary hearing that was scheduled in this case, six weeks after M.W. was placed in Lock Towns, complies with this requirement.[35] In contrast, the amicus Legal Aid Society of Palm Beach County argues that because placement in a residential facility for mental health treatment requires an amendment to the case plan, M.W. could not be committed to a residential mental health facility without prior notice and a judicial determination following a hearing that competent evidence supported the need to amend the case plan.
We are convinced that the procedures and protections for the child should be explicitly spelled out when the Department is seeking this type of commitment, even on a temporary basis. An order approving the placement of a fifteen-year-old dependent child in a locked residential facility against the wishes of that child deprives the child of liberty and requires clear-cut procedures to be followed by the dependency court judge. We contrast this dearth of procedural guidance with the specific rules governing the procedures for taking children into custody, shelter petitions and hearings, adjudicatory hearings, disposition hearings, the initial approval of case plans and judicial reviews. See Fla. R. Juv. P. 8.300, 8.305, 8.330, 8.340, 8.410, 8.415. Even rule 8.410(c), which governs amendments to case plans, does not specify what type of hearing should be held and what type of evidence should be received before the court approves an amendment to a case plan not agreed to by the parties.
While the child's best interests may in fact be paramount in the eyes, minds and hearts of every participant in the dependency *108 proceeding, it is important that our procedures in dependency cases ensure that each child is treated with the dignity to which every participant in a dependency proceeding should be entitled. It is true that the dependency court, a citizen review panel, the Department and multiple psychiatrists and psychologists were involved in M.W.'s case and all were concerned with his best interests. However, of paramount concern is the question of whether M.W. perceived that anyone had his best interests at heart when he was placed against his wishes in a locked psychiatric facility without the opportunity to be heard.
Indeed, the issue presented by this case extends beyond the legal question of what process is due; rather, this case also presents the question of whether a child believes that he or she is being listened to and that his or her opinion is respected and counts. See generally Gary B. Melton, et al., No Place to Go: The Civil Commitment of Minors 146-47 (1998) (stating that children obtain psychological benefit from procedural protections prior to being placed in psychiatric treatment facilities); cf. Amendment to Fla. Rule of Juv. Pro. 8.100(a), 753 So.2d 541 (Fla. 1999) (Lewis, J., dissenting) (expressing concern that audio-video detention hearings reduce juveniles' perception that they are receiving a fair hearing). This question is particularly important when the child is an adolescent like M.W., who was fifteen years of age when he was placed in Lock Towns.
Whether or not an evidentiary hearing is constitutionally mandated, our legal system at the very least should afford the child, through his or her attorney and/or guardian ad litem, a meaningful opportunity to be heard. The ultimate goal of any procedure should be to balance the flexibility and informality characteristic of dependency proceedings with the need for procedural safeguards prior to placing a dependent child in a residential psychiatric treatment facility, which may constitute a temporary or prolonged loss of liberty. In striking this balance, the judicial system must recognize the individuality and dignity of the children who find themselves inside the courtroom solely as a result of their parents' abuse or neglect.[36]
The Guardian Ad Litem Program of the Eleventh Judicial Circuit asks this Court in resolving the issue in this case to find that the Baker Act procedures are not incorporated into the statute because dependency courts are already "bursting at the seams," lacking the time and resources to accomplish the procedures that are already statutorily required. This harsh reality only highlights what this Court has repeatedly stated: reasonable workloads are essential to the proper functioning of dependency courts in performing the multiple important reviews and hearings required of them by law and necessary for the best interests of the children. See In re Certification of the Need for Additional Judges, 755 So.2d 79 (Fla.2000); In re Certification of the Need for Additional Judges, 728 So.2d 730, 734 (Fla.1999). Last year, in our certification opinion, we detailed the increased burdens on the judiciary corresponding to the increases in statutorily mandated dependency hearings. See In re Certification, 728 So.2d at 734. The fact that the dependency court judge in this case said that she could not hold an evidentiary hearing for six weeks after the order of commitment is a graphic example of this problem.
However, we have recognized "the obligation of the Judicial Branch to join with the Executive and Legislative Branches to give priority to our state's most precious *109 resourceour children." Id. Thus, we cannot eschew the necessity for a hearing before a dependent child is placed in residential treatment against his wishes simply because other statutorily mandated hearings are already required or because it would otherwise burden our dependency courts.

CONCLUSION
In conclusion, it is reasonable to find that the Legislature intended the language in section 39.407(4) incorporating the procedures for involuntary commitment to apply to children who are in emergency shelter, but not to those children who have been adjudicated dependent and placed in the temporary legal custody of the Department. Accordingly, we answer the certified question in the negative and approve the decision of the Fourth District ruling that the trial court's order in this case was neither void nor illegal. We emphasize, however, that our holding in this case is limited to answering the certified question and should not be construed as precedent for allowing a several-week delay in holding an evidentiary hearing regarding the placement of a dependent child into a residential mental health treatment facility.
Nevertheless, for the future, the procedures that the dependency court must follow before residential treatment is ordered should be clearly set forth for the guidance of dependency court judges, the Department and the parties to the dependency proceeding. As stated above, at a minimum, these procedures should include a hearing in which the child has a meaningful opportunity to be heard. Accordingly, we direct that the Juvenile Court Rules Committee submit to this Court no later than June 30, 2000, proposed rules that will set forth the procedures to be followed by the dependency court when the Department of Children and Families seeks an order committing a dependent child to a residential facility for mental health treatment. The Committee shall give due regard to both the rights of the child and the child's best interests. We urge the Committee to look at proposed rules filed by the Guardian Ad Litem amicus in this case, the rules in other states and in particular New Jersey's procedural rules addressing this issue.[37] In light of the disagreement as to what procedures should be followed when the case plan is amended, we further request that the Juvenile Court Rules Committee review rule 8.410(c), governing the amendment of case plans, to determine if clarification is required.
It is so ordered.
HARDING, C.J., and SHAW, ANSTEAD, LEWIS and QUINCE, JJ., concur. WELLS, J., concurs in result only.
NOTES
[1] The Florida Mental Health Act, also known as the Baker Act, is found in part I of chapter 394, from sections 394.451 to 394.4789. See § 394.451, Fla. Stat. (1997).
[2] No information concerning M.W.'s father appears in our record. M.W.'s mother has filed a brief in this Court adopting the position advocated by M.W.'s counsel that a hearing comporting with the Baker Act is required.
[3] On April 28, 1997, the dependency court appointed the University of Miami Children & Youth Law Clinic as attorney ad litem to represent M.W. The order of appointment requires the Clinic to "provide legal services to the child under the same traditional duties of undivided loyalty, confidentiality, and competent representation owed to an adult client" and also to "represent the Child's express preferences."
[4] According to the evaluation done by Palmetto General, M.W. was admitted due to a history of depression and self-destructive behaviors such as running away and aggression.
[5] At a hearing in May 1998, a dependency court judge told M.W. that he would be discharged from Palmetto General the next day and placed in foster care. The next day, however, when M.W. learned that he would not be released from Palmetto General because no appropriate foster care placements were available, he "began escalating" and acted out until he had to be placed temporarily in isolation. We mention this because one of the recurring problems in M.W.'s case appears to have been the lack of available appropriate placements for him. One of the concerns expressed in the amicus brief jointly filed by the Children First Project, the American Civil Liberties Union (ACLU), the Advocacy Center for Persons with Disabilities, Inc., and the National Association of Counsel for Children is that dependent children may be placed unnecessarily in residential mental health treatment facilities due to a lack of appropriate less restrictive environments. While we can understand this concern, there is no indication in this case that the recommendations to place M.W. in residential treatment were motivated by anything other than concern for M.W.'s best interests.
[6] Although M.W. points out that the court's signed order made explicit reference to sections 39.407, Florida Statutes (Supp.1998) and 394.467, Florida Statutes (1997), we do not deem that fact dispositive of the issue in this case.
[7] M.W. emphasizes the statement of the dependency court judge at that hearing that "I don't have time to have a hearing just so [M.W.] can exercise his constitutional rights." However, it appears from reading the entire transcript of the hearing that the judge did not set the evidentiary hearing at that time because she considered it premature until the independent examination had been completed.
[8] Both Palmetto General and M.W.'s counsel ultimately reported the Department to the abuse hotline for neglect for failing to pick up M.W. from Palmetto General when the hospital attempted to discharge him.
[9] M.W. and his mother were both present at this hearing.
[10] In certain cases, the Department may provide administrative reviews of dependent children's cases. See § 39.701(3)(d), Fla. Stat. (Supp.1998). Chapter 39 authorizes the creation of a "citizen review panel" in each judicial circuit. See § 39.702, Fla. Stat. (Supp.1998). Five volunteer members sit on each citizen review panel and have the authority to make recommendations to the dependency court prior to a judicial review. See § 39.702(3)-(4). Although the statute refers to a citizen review panel, the parties and the Fourth District refer to this panel as the Case Review Committee.
[11] M.W. asserts that his counsel did not receive notice prior to the review by the citizen review panel. However, we cannot evaluate the accuracy of this assertion on our limited record. The order appointing M.W.'s attorney specifically required that counsel be given written notice of all administrative staffings, citizen review panel proceedings and judicial reviews.
[12] Lock Towns Adolescent Care Program is located on the grounds of South Florida State Hospital for adults in Pembroke Pines.
[13] M.W. first filed a petition for habeas corpus in the Third District Court of Appeal, which was "denied for lack of jurisdiction." Although the Third District did not provide an explanation for the denial of the habeas petition, this Court has explained that "a district court of appeal does not have the constitutional power to issue a writ [of habeas corpus] directed to a person outside the district court's territorial jurisdiction." Alachua Reg'l Juvenile Detention Ctr. v. T.O., 684 So.2d 814, 816 (Fla.1996).
[14] Notably, the district court was confronted with a writ of habeas corpus, rather than a direct appeal from a dependency court within its appellate jurisdiction. As the Fourth District recognized, an appellate court's scope of review of a habeas petition is limited to determining whether the trial court lacked jurisdiction to issue the order and whether the order is void or illegal. See Alachua, 684 So.2d at 816; M.W. v. Davis, 722 So.2d 966, 967-68 (Fla. 4th DCA 1999).
[15] The few district court opinions addressing the Department's authority to place children in residential treatment facilities have dealt with an entirely different aspect of the issue: whether a trial court can mandate the Department to place a child in a residential treatment facility even though no placements are available. See, e.g., Department of Children & Family Servs. v. I.C., 742 So.2d 401, 403 (Fla. 4th DCA 1999); State Department of Health & Rehabilitative Servs. v. Brooke, 573 So.2d 363, 368-69 (Fla. 1st DCA 1991); Department of Health & Rehabilitative Servs. v. V.L., 583 So.2d 765, 766-67 (Fla. 5th DCA 1991).
[16] In resolving this issue, this Court had the benefit of three amicus briefs with varying views. These views reflect the complexity of the issue facing us. An amicus brief filed by the Legal Aid Society of Palm Beach County asserts that the Legislature did not intend to require a Baker Act hearing prior to approving the placement of a dependent child into a residential mental health treatment facility. According to the Legal Aid Society, existing dependency procedures, such as the requirement that the dependency court approve a case plan for each child and hold periodic judicial review hearings, protect the best interests of dependent children better than a Baker Act hearing. Notably, the Legal Aid Society expresses concern that M.W. had not received these procedural protections before being placed in Lock Towns. Similarly, the Guardian Ad Litem Program of the Eleventh Judicial Circuit advocates that proper procedures currently exercised by the dependency courts will better assure the child's safety and mental health than the procedures required by the Baker Act. In addition, the Guardian Ad Litem Program asserts that the procedures M.W. received satisfied constitutional due process requirements.

A contrary view is expressed in an amicus brief filed jointly by the Children First Project, the ACLU, the Advocacy Center for Persons with Disabilities, Inc., and the National Association of Counsel for Children. The ACLU takes the position that the Baker Act applies. Children First argues that a judicial or administrative hearing is required, although the hearing is not required to follow the requirements of the Baker Act. Finally, the Advocacy Center does not take a position as to the applicability of the Baker Act, but concludes that fundamental due process has been violated in this case. All of those joining in this amicus brief agree that at a minimum, the child must be given notice, an opportunity to be heard, and counsel before the child is placed in a residential psychiatric facility.
[17] Although M.W. also asserts in this Court that his constitutional right to privacy has been violated by his placement in Lock Towns, this argument was not raised in the petition for writ of habeas corpus filed in the Fourth District and therefore is not preserved for our review. See generally Metropolitan Dade County v. Chase Federal Housing Corp., 737 So.2d 494, 499 n. 7 (Fla.1999).
[18] The issue of whether a child who was being committed to a residential facility would be entitled to counsel is not before us because in this case counsel was appointed to represent M.W.'s "express preferences" and "actual positions."
[19] Justice Brennan, joined by Justices Marshall and Stevens, dissented on the issue of what procedures are constitutionally required when the child is a ward of the state. See Parham v. J.R., 442 U.S. 584, 636-39, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (Brennan, J., concurring in part and dissenting in part). Justice Brennan wrote that "there is no justification for denying children committed by their social workers the prior hearings that the Constitution typically requires." Id. at 637, 99 S.Ct. 2493. In addition, he observed that the social worker-child relationship is not deserving of the deference accorded the parent-child relationship, and that when a child is already in state custody, prehospitalization hearings will not prevent children from receiving needed care. See id. at 637-38, 99 S.Ct. 2493.
[20] The Court directed the district court to consider this issue on remand. See Parham, 442 U.S. at 619, 99 S.Ct. 2493.
[21] Although M.W. and the Children First amicus also rely on United States Supreme Court cases regarding the scope of procedural due process protections in delinquency proceedings, see, e.g., In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), these cases are not instructive because they were issued prior to the decision in Parham and involve the commitment of delinquent, rather than dependent, children. This Court discussed the distinction between the constitutional rights implicated in delinquency versus dependency proceedings in In re D.B., 385 So.2d 83, 90-91 (Fla.1980).
[22] In Parham, the United States Supreme Court recognized that additional, periodic review may be necessary when the child admitted into the psychiatric facility is a ward of the state. 442 U.S. at 619, 99 S.Ct. 2493. However, we do not reach the issue of whether the post-commitment proceedings were in accordance with the minimum constitutional requirements of Parham because the habeas petition and the certified question address only the question of the adequacy of the precommitment procedures. Although our record as to the post-commitment proceedings are incomplete, we note that the citizen review panel has reviewed M.W.'s case three times since his commitment, approximately every five months. At each judicial review, the dependency court reviewed and approved the findings of the citizen review panel. At the last review, the citizen review panel found that M.W.'s current placement at Lock Towns is appropriate and safe. Further, although M.W. makes allegations in his brief that while in Lock Towns, M.W. has been "subjected to the forced administration of psychotropic medications, four-point leather restraints, rigid behavior management controls, and seclusion," we decline to address these claims because we do not have a factual record to evaluate them and the Fourth District did not address them in its opinion. In addition, the record does not reflect that M.W. has ever sought relief in the trial court on the basis of these factual allegations. Cf. Harvard v. Singletary, 733 So.2d 1020, 1023-24 (Fla.1999) (stating that this Court will decline to exercise its original writ jurisdiction over those cases requiring a factual determination and not requiring resolution by this Court).
[23] M.W. has not advanced the argument in this Court that the Florida Constitution provides greater due process protection than the United States Constitution. Accordingly, we do not address this question.
[24] Chapter 393 is entitled "Developmental Disabilities." Section 393.11, Florida Statutes (Supp.1998), provides procedures for when "a person is mentally retarded and requires involuntary admission to residential services provided by the developmental services program" administered by the Department of Children and Families.
[25] A dependent child is also defined as including one who was voluntarily placed with a child-placing agency, adult relative, or the Department, as well as a child with no parent or legal custodian capable of providing supervision or care. See § 39.01(14), Fla. Stat. (Supp.1998).
[26] M.W. asserts that the amendment to section 39.407(4) in chapter 99-193, § 24, Laws of Florida, demonstrates a contrary legislative intent. In this amendment, the Legislature deleted the term "the physical custody of the Department" so that section 39.407(4) now applies to "a child in an out-of-home placement." § 39.407(4), Fla. Stat. (1999). The dependency judge in this case was faced with construing the 1998 version of the statute, and we do not consider the 1999 amendment to be a clarifying change that should be considered in determining the legislative intent. In this case, the Legislature added the "physical custody" language in 1986, see ch. 86-220, § 74, Laws of Florida, which was thirteen years prior to the 1999 amendment. Due to the gap between when the language was originally placed in the statute and the most recent amendment, the 1999 amendment cannot be seen as clarifying the Legislature's intent in 1986 in limiting the incorporation of the Baker Act proceedings to those children in the "physical custody" of the Department. See State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 62 (Fla.1995) ("It would be absurd, however, to consider legislation enacted more than ten years after the original act as a clarification of original intent."). Further, even if we considered this new language, it would not alter our construction. The structure of chapter 39, giving the Department the authority to provide medical and psychiatric care for children who have been adjudicated dependent and placed in its temporary legal custody, remained unchanged in 1999. While this is not dispositive, we note that the legislative history of this amendment indicates that it was intended to "correct errors and inconsistencies resulting from last year's major reorganization of the chapter during the 1998 session." Fla. S. Comm. on Judiciary and Children and Families CS/CS/SB 1666 (1999) Staff Analysis 1 (April 15, 1999) (on file with comm.) (citations omitted).
[27] If the court does not approve the case plan at the disposition hearing, the court can require the parties to amend the plan and the court must set a hearing within 30 days after the disposition hearing to review and approve the case plan. See § 39.508(1), (6), Fla. Stat. (Supp.1998).
[28] The case plan must also include a description of the problems being addressed by the case plan and the measurable objectives for addressing these problems, as well as a "description of the type of home or institution in which the child is to be placed." § 39.601(2)(a), (c), (3)(b); see M.W., 722 So.2d at 969. The case plan must be "developed in conference with the parent, caregiver, or legal custodian of the child and any court-appointed guardian ad litem, and if appropriate, the child." § 39.601(1)(a).
[29] If the court extends a case plan beyond one year, a judicial review must be conducted every six months. See § 39.701(3)(b), Fla. Stat. (Supp.1998). No more than twelve months after the child is taken into shelter, the dependency court must conduct a judicial review to plan for the permanency goal for the child. See § 39.701(7)(f). Although citizen review panels may conduct hearings to review the status of the child, the parties have a right to object to referral to a citizen review panel and take exception to the findings and recommendations made by the panel. See § 39.701(2)(b).
[30] In addition, we note that the Baker Act procedures in general, and their effect on children in particular, have been the subject of a recent report of this Court's Commission on Fairness. See Supreme Court Comm. on Fairness, Judicial Administration of the Baker Act and its Effect on Florida's Elders: Report and Recommendations at 97-99 (Dec.1999) (on file with Court Adm'r, Fla. Sup.Ct.). In the December 1999 Report and Recommendations, the Commission on Fairness recommended that the Florida Legislature "should direct and fund a comprehensive interdisciplinary study on the legal needs of children under the Baker Act, including but not limited to: ... whether a child's right to petition for habeas corpus pursuant to Chapter 394 is adequately protected and whether legal counsel should be provided" and "whether judicial review of placement of children in mental health facilities should be required, to ensure the appropriateness of involuntary placements and the voluntariness of voluntary admissions." Id. at 99.
[31] M.W. also contends that a child's placement in a residential psychiatric treatment facility can never be considered "voluntary" if the child does not personally consent to treatment. In making this argument, M.W. relies upon the Baker Act's protections against involuntary commitment to a receiving or treatment facility and statutory limitations on the authority of guardians appointed pursuant to chapter 744, Florida Statutes. However, we reject M.W.'s reliance on the Baker Act as well as statutes governing guardianship proceedings. The procedures through which a court approves the placement of a dependent child, regardless of whether the placement is in foster care, therapeutic foster care, or a residential psychiatric treatment facility, are found in chapter 39. In construing statutes, a specific statute governing a particular subject takes precedence over a conflicting more general statute. See People Against Tax Rev. Mismanagement, Inc. v. County of Leon, 583 So.2d 1373, 1377 n. 5 (Fla.1991); see also State v. Raydo, 713 So.2d 996, 1001 (Fla. 1998); McKendry v. State, 641 So.2d 45, 46 (Fla.1994) ("[A] specific statute covering a particular subject area always controls over a statute covering the same and other subjects in more general terms."). If a specific and general statute are inconsistent, "the more specific statute is considered to be an exception to the general terms of the more comprehensive statute." McKendry, 641 So.2d at 46. The procedures in chapter 39 are specifically tailored to the placement of dependent children. To the extent that the Baker Act is not specifically incorporated in section 39.407(4), the provisions in chapter 39 concerning the placement of dependent children should govern. As the Fourth District reasoned, although court approval is required, "that approval is pursuant to Chapter 39, not the Baker Act." M.W., 722 So.2d at 969.
[32] In addition, the Department points to the Comprehensive Child and Adolescent Mental Health Services Act, found in Part III of chapter 394, which requires the Department to provide an "array of services" for emotionally disturbed children in state custody, including residential treatment programs. See §§ 394.492(5)-(7), .493(1), .495(1), Fla. Stat. (Supp.1998). Under the Department's regulations, in order to "be eligible" to be admitted to a residential treatment program, the child must be under the age of eighteen and

currently assessed as emotionally disturbed by a clinical psychologist or by a psychiatrist licensed to practice in the State of Florida, with experience or training in children's disorders; be impaired to the extent that residential services are required; and
(c) Have been assessed by the appropriate district multidisciplinary team and determined eligible for service.
Fla. Admin. Code R. 65E-10.018 (1998). Here, two psychologists determined that it was necessary to place M.W. in a residential psychiatric facility.
[33] The Legislature has set forth the goal that children in shelter or foster care "have a guardian ad litem appointed to represent, within reason, their best interests and, where appropriate, an attorney ad litem appointed to represent their legal interests." § 39.4085(20), Fla. Stat. (1999). Section 39.822(1), Florida Statutes (Supp.1998), provides that "[a] guardian ad litem shall be appointed by the court at the earliest possible time to represent the child in any child abuse, abandonment, or neglect judicial proceeding, whether civil or criminal." See also Fla. R. Juv. P. 8.215(b) ("The court shall appoint a guardian ad litem to represent the child in any proceeding as required by law and shall ascertain at each stage of the proceeding whether a guardian ad litem has been appointed."). The guardian ad litem "shall be an attorney, a responsible adult, or a certified guardian ad litem program." Fla. R. Juv. P. 8.215(c). In this case, an attorney was appointed to represent M.W's actual legal interests, but M.W. did not have a guardian ad litem at the time of the proceedings at issue.
[34] We note that legislation is pending that would explicitly set forth certain procedures to be used before a child who has been adjudicated dependent may be placed in a residential psychiatric facility. See Fla. CS/SB 682 (2000); Fla. HB 2347 (2000). The amendment of section 39.407 would be an important step in specifying what steps are required to be taken before a child may be placed in residential treatment.
[35] We also note that on August 27, 1999, the citizen review panel found that the Department was in non-compliance because no amended case plan was in effect. While we are concerned that no evidentiary hearing has yet taken place, we also note that none of the parties have asked this Court to relinquish jurisdiction for the purpose of holding an evidentiary hearing, nor did the parties ask this Court to expedite our review of this case. To the contrary, in this Court, both parties have moved for extensions of time to file various briefs.
[36] Ironically, our rules provide more procedural protections in this situation for children in the custody of the state because they are delinquent than for those children who are in the custody of the state because they have been adjudicated dependent through no fault of their own. Cf. Fla. R. Juv. P. 8.095(a) (providing a procedure to commit a child to the custody of the Department when the child is charged with a delinquent act but is incompetent to proceed with the trial).
[37] See In re Commitment of N.N., 146 N.J. 112, 679 A.2d 1174, 1187 (1996).