PARIENTE, Judge.
C.S. and J.S., biological relatives (the biological relatives) of S.D.V-H., a minor, appeal from a final judgment of adoption in favor of S.H. and K.H., foster parents (the foster parents) of S.D.V-H. We reverse the final judgment of adoption because the trial court had no authority to interfere with HRS’s decision to select the biological relatives as prospective adoptive parents of S.D.V-H., a child committed to the custody of HRS, where HRS’s selection was appropriate, consonant with its policies and made in an expeditious manner.
We first review the background facts and complicated procedural history of this case. S.D.V-H., a baby girl, was born on August 13, 1992. At the time of her birth, she was premature, afflicted with bacterial venereal disease, addicted to crack cocaine and had four hernias. HRS filed a dependency action after S.D.V-H.’s birth. On September 22, 1992, HRS placed S.D.V-H. in temporary foster care with the foster parents. To qualify as foster parents, S.H. and K.H. were required to execute an agreement with HRS entitled “Agreement to Provide Substitute Care for Dependent Children.” The agreement, as signed by the foster parents, provided:
As substitute care parent(s) for the Department of Health and Rehabilitative Services, we agree to the following conditions considered essential for the welfare of this dependent child placed in our home:
1. This child is placed in our home on a temporary basis and is at all times under the supervision and control of [HRS]....
******
*263 3. We mil take no action to acquire legal custody or guardianship of the child.
* # * * * ⅜
7. We will cooperate in arrangements made by [HRS] for visits with the child by his parent(s) or other relative(s)
8. We will participate with [HRS] in planning for the child, which may include adoption placement, transfer to another foster home, or return to parent(s) or relative(s)
* # * * * ijs
13. [HRS] may remove the child from our home at any time but will, whenever possible, give us at least two weeks notice.
C.S., the child’s biological aunt who resided in upstate New York, first learned of S.D.VH.’s birth from her sister in December of 1992. She did not give immediate credence to this representation due to prior false statements by her sister. When, in April of 1993, the birth of S.D.V-H. was confirmed, C.S. and her husband, J.S., immediately began to take steps to qualify as adoptive parents.
On April 12,1993, HRS filed a Petition for Termination of Parental Rights seeking to terminate the natural mother’s parental rights. The father of S.D.V-H. was unknown. With the natural mother’s consent, her parental rights were terminated by an order entered on June 30, 1993.[1] Pursuant to that order, S.D.V-H. was placed in the permanent custody of HRS for adoptive placement. See § 39.41, Fla.Stat. (1993).[2]
HRS immediately arranged for a home study of the biological relatives who resided in upstate New York. After a favorable home study, on November 8, 1993, HRS advised the foster parents of its decision to approve the biological relatives as adoptive parents.
In late November 1993 the biological relatives, with HRS’s approval, travelled from New York to Florida to visit with S.D.V-H. and return with her to New York. The foster parents refused to surrender S.D.V-H. to HRS or the biological relatives. The foster parents’ refusal was in clear violation of their agreement with HRS. Further, in December 1993, the foster parents filed a complaint for injunctive relief alleging that HRS should be equitably estopped from withholding its consent to the foster parents as adoptive parents. The foster parents alleged that HRS had promised them approval as adoptive parents.[3] A temporary injunction was entered on December 6,1993, enjoining HRS from removing S.D.V-H. from the custody of the foster parents.
At about the same time as the foster parents’ claim for injunctive relief, both the biological relatives and the foster parents separately petitioned for adoption of S.D.V-H. HRS and the biological relatives moved to dismiss the foster parents’ adoption petition on the basis that they lacked standing to adopt because they did not have HRS’s consent; they had not been selected by HRS as adoptive parents; and no required home study had been performed by HRS. This motion was denied. The trial court, however, granted the foster parents’ motion to dismiss the biological relatives’ adoption petition on the ground that the biological relatives were not Florida residents, a statutory prerequisite. See § 63.185, Fla.Stat. The trial court, nonetheless, allowed the biological relatives to intervene in the injunction proceedings and adoption proceedings in light of the foster parents’ designation and formal approval by HRS as adoptive parents and in light of their pending adoption petition filed in New York.
On April 7, 1995, Judge Richard Oftedal entered a detailed twelve-page order denying *264 the foster parents’ request for a permanent injunction and request for equitable relief.[4] Judge Oftedal found untenable S.H.’s position that HRS promised her that the foster parents would be the adoptive parents. The order contained the further findings that at no time did HRS “promise the [foster parents] that they would be either approved or recommended as adoptive parents.” Rather, Judge Oftedal found that HRS had cautioned S.H. that it was HRS’s policy at that time to accord relatives priority in adopting children in its custody.
Judge Oftedal specifically noted that the foster parents had received their foster care license from HRS despite concerns on the part of an HRS trainer that “their primary motivation was to adopt children in the foster care system rather than to provide temporary care for children” in HRS’s custody. Judge Oftedal concluded that it was not the representations of HRS that formed the basis of S.H.’s claim of estoppel:
The more likely explanation is that [S.H.], in her fervent and long-standing desire to adopt, chose to ignore [HRS]. As a result, repeated statements that relatives are accorded priority by DHRS in placement proceedings fell on deaf ears.
Prior to the commencement of the hearing in the Florida adoption proceeding, the biological relatives filed a renewed motion to dismiss the foster parents’ petition for adoption, asserting that the trial court’s order of April 7, 1995, which rejected the foster parents’ claim of equitable estoppel, was disposi-tive. ’ This motion to dismiss was also denied.[5]
A trial on the adoption petition was held in October 1995 before Judge Jack Cook, Judge Oftedal’s successor in the family division. Two psychologists testified in connection with S.D.V-H.’s bonding and potential for damage if removed from the foster parents’ home. Dr. Lori Wasserman testified on the foster parents’ behalf. Dr. Wasserman became involved with S.D.V-H. at the request of the foster parents’ attorney about the same time HRS approved the biological relatives as adoptive parents. She testified that to sever S.D.V-H. from her foster parents at this age (three years old at the time of the hearing) would be extremely detrimental as she had bonded with the foster parents. Dr. Wasserman did acknowledge that it would be possible to transfer S.D.V-H. from one loving home to another if the adults cooperated fully and worked toward that goal.
Dr. MeGraw, the chief psychologist for the juvenile court, was appointed by the trial court to evaluate the effects of a transition from the foster home to the biological relatives. He concluded that S.D.V-H. would experience stress from the transition, but that such stress would be at acceptable levels. He concluded that S.D.V-H. would “do fine” and that he did not anticipate any permanent psychological dysfunction or impairment.
Consistent with Dr. Wasserman, Dr. MeGraw testified that the success of the transfer was dependent on the cooperation of the adults involved. Both he and Dr. Was-serman stated that there are very few studies regarding the effects of severing foster children at this age where the child has been in one stable home from birth. But Dr. MeGraw testified that the separation would not be difficult because S.D.V-H. is emotionally healthy and has the ability to separate and re-bond.
*265 The trial court’s order contains no finding that HRS’s selection of the biological relatives as adoptive parents was inappropriate.[6] According to the home study, the biological relatives live in upstate New York in a 200-year-old family farmhouse that is located on 22 acres of their land. They have two boys, aged 13 and 15, and an extended family nearby. C.S., age 38, has a degree in occupational education and works as a teacher/trainer for the New York Child Care Council. J.S., age 40, has a degree in religion/youth counseling and occupational education, and is a carpenter by trade.
There is less information in the record on the foster parents. This is the foster parents’ second marriage. They do not have children together, but they are both grandparents and all their children are adults. K.H., who is 61 years of age, is a retiree and works as a maintenance supervisor. They reside in one of the apartment complexes which KH. maintains.
The trial court found both couples to “possess outstanding parenting skills” and to be “motivated by what they believe to be [S.D.Y-H.’s] best interests.” The trial court concluded, however, that to remove the child from her “loving, caring and nurturing environment” would result in psychological stress to the child. The trial court determined it had authority to grant the foster parents’ adoption petition notwithstanding HRS’s selection of the biological relatives as the adoptive parents because HRS unreasonably withheld its consent to adopt from the foster parents. The trial court reasoned that HRS had acted unreasonably because it was in the child’s best interests for the foster parents to adopt the child given the length of time that the child had remained with the foster parents and the bonding which had occurred.
No mention is made in the trial court’s decision of the fact that, as of December 1993, HRS had approved the biological relatives as adoptive parents and the biological relatives were ready, willing and able to adopt S.D.V-H. At that point, the biological relatives could have proceeded with the adoption in New York State pursuant to the Interstate Compact on the Placement of Children, see § 409.401, Fla.Stat., with the blessing of HRS, but for the actions of the foster parents in refusing to abide by HRS’s decision and their written agreement with HRS. Because the injunction remained in effect until October 1995, the time of the final hearing, the trial court effectively set in motion the sole justification for its final decision — the three-year bonding of the foster parents and S.D.V-H.
As a preliminary matter, the foster parents contest the biological relatives’ standing to bring this appeal. The biological relatives were permitted to intervene in both the injunction action and the adoption proceedings below. They are blood relatives approved as adoptive parents by HRS. Their interests would be directly and adversely affected if we were to approve the final judgment of adoption. The biological relatives have a direct interest in the outcome of this appeal and thus, have standing to bring this appeal. See Fla.R.Civ.P. 1.230; Union Cent. Life Ins. Co. v. Carlisle, 593 So.2d 505 (Fla.1992); In re Adoption of a Minor Child, 593 So.2d 185 (Fla.1991); cf. Stefanos v. Rivera-Berrios, 671 So.2d 12 (Fla.1996).
The biological relatives and Children First, amicus curiae, contend that the provisions of Chapter 39 unambiguously vest exclusive authority in HRS to select adoptive homes for children who are committed to HRS’s custody. They further argue that the trial court’s actions in approving the foster parents’ petition for adoption exceeded its statutory authority and violated the doctrine of separation of powers, as set forth in Article II, § 3 of the Florida Constitution, between the judiciary and the executive branches.
*266 Critical to the resolution of the legal issues in this case is how to harmonize the provisions of Chapter 39, Parts III, V and VI, relating to children in the custody of HRS, with the provisions of Chapter 63 relating to all adoption proceedings. Within these chapters, the legislature has created a comprehensive statutory scheme which sets forth the role of HRS regarding the placement and adoption of children whose parental rights have been terminated and the role of the judiciary in supervising those activities.
Subsection 39.469(2) empowers the judiciary to place children whose parents’ rights have been terminated in the “custody of [HRS] for purpose of adoption” or in the custody of a licensed child-placing agency. When HRS is granted custody of a child pursuant to Chapter 39, as occurred in this case, HRS has “the right to determine where and with whom the child shall live....” See § 39.41(5), Fla.Stat.[7] After a child is placed in the custody of HRS following the termination of parental rights, section 39.47, provides as follows:
(1) A licensed child-placing agency or the department which is given custody of a child for subsequent adoption in accordance with this chapter may place the child in a family home for prospective subsequent adoption and may thereafter become a party to any proceeding for the legal adoption of the child and appear in any court where the adoption proceeding is pending and consent to the adoption; and that consent alone shall in all cases be sufficient.
(Emphasis supplied). Subsection 39.47(4) provides that the court retains jurisdiction over the child subject to specific limitations:
The court shall retain jurisdiction over any child for whom custody is given to a licensed child-placing agency or to the department until the child is placed for adoption. After custody of a child for subsequent adoption has been given to an agency or the department, the court has jurisdiction for the purpose of reviewing the status of the child and the progress being made toward permanent adoptive placement, pursuant to the provisions of part V of this chapter [children in foster care], but this jurisdiction does not include the exercise of any power or influence by the court over the selection of an adoptive parent.[8]
(Emphasis supplied).
Part V of Chapter 39 addressing children in foster care similarly provides in subsection 39.453(l)(c) that:
After termination of parental rights, the court shall retain jurisdiction over any child for whom custody is given to a social service agency until the child is placed for adoption. The jurisdiction of the court after termination of parental rights and custody is given to the agency is for the purpose of reviewing the status of the child and the progress being made toward permanent adoptive placement pursuant to this part, and such jurisdiction does not include the exercise of any power or influence by the court over the selection of an adoptive parent.
(Emphasis supplied).
The jurisdiction granted to the trial court to review HRS’s actions concerning permanent adoptive placement is derived from statutory authority. See In Interest of L.W., 615 So.2d 834 (Fla. 4th DCA 1993). While the courts have supervisory authority under Chapter 39, the authority is circumscribed. In In Interest of K.A.B., 483 So.2d 898 (Fla. *267 5th DCA 1986), the fifth district held that the trial court could not order HRS, as legal custodian of the child, to place the child in the facility chosen by the trial court because the trial court did not have supervisory authority over the agency’s choice of where to place the child:
Thus, it is crystal clear that it is within the discretion of the agency to decide where to keep a child who is in its custody. The agency is, of course, better equipped to make day-to-day health and welfare decisions which concern the child, (citations omitted.)
Id. at 899.
In Matter of S.G., 517 So.2d 125 (Fla. 4th DCA 1987), a child was declared dependent and committed permanently to HRS until further court order. A couple unrelated to the child, who had taken an interest in the child’s welfare, petitioned the court to obtain custody and the trial court awarded custody to the couple over HRS’s objection. This court held that in light of the fact that the child had already been permanently committed to HRS, pursuant to subsection 39.41(l)(f), Florida Statutes (1985), it was error for the trial court to award permanent custody to the couple over HRS’s objection and absent compliance with the appropriate statute.
In Department of Health and Rehabilitative Services v. Doe, 643 So.2d 1100 (Fla. 1st DCA 1994), a couple had obtained custody of an infant through a private adoption. Two months later, the infant’s older sibling was permanently committed to HRS when parental rights were terminated. HRS intended to place the sibling permanently with the foster parents, not the couple who had adopted the infant. The trial court ordered HRS to consider the couple, and not the foster parents, as prospective parents.'
The first district quashed the trial court’s order finding that it contradicted the plain language of subsection 39.47(4), which restricts the court’s jurisdiction in adoptive placement. The first district noted that the circuit court’s jurisdiction “specifically ‘does not include the exercise of any power or influence by the court over the selection of an adoptive parent.’ ” Doe, 643 So.2d at 1101 (quoting § 39.47(4), Fla.Stat.).
Under the 1994 statutory amendment, the jurisdiction has been expanded to allow courts to review “the appropriateness of the adoptive placement.” § 39.453(l)(c), Fla.Stat.[9] Even prior to the 1994 amendment, we construed subsection 39.453(7)(g), which requires the trial court to consider “the appropriateness of the child’s current placement,” to be applicable to post-termination jurisdiction of the courts. See L.W., 615 So.2d at 837-38. This judicial review, however, does not extend to authorize the trial court to make a different selection from HRS or determine that another set of parents would be more appropriate.
At the heart of the separation of powers issue between the judiciary and HRS in this case is the extent to which the trial court was statutorily authorized to scrutinize HRS’s selection decision. See generally State, Dep’t of Health & Rehab. Servs. v. Brooke, 573 So.2d 363 (Fla. 1st DCA 1991). Both Doe and this court’s decision in L.W. recognize that while trial courts have authority to oversee the status of the child and the progress toward permanent adoptive placement, they are not vested with unlimited authority over children permanently committed to HRS after termination of parental rights.
The trial court agreed that it could not interfere with HRS’s selection of adoptive parents, acknowledging that selection is “an administrative function which the legislature has placed in its sole discretion.” It did not construe its decision to approve an adoption petition of a couple other than one selected by HRS as an exercise of the court’s continuing supervisory jurisdiction under Chapter 39 to monitor the progress of HRS to make a permanent placement. See L.W. Instead, the trial court distinguished Doe, reasoning that it was not selecting the adoptive parents, but merely ruling on the merits of a petition for adoption.
*268 The trial court determined it had authority under subsection 63.072(4) to waive HRS’s consent if it concluded that such consent had been unreasonably withheld. Section 63.072 is entitled “persons whose consent may be waived.” Subsection 63.072(4) provides:
The court may excuse the consent of the following individuals to an adoption ... A legal guardian or lawful custodian of the person to be adopted, other than a parent, who has faded to respond in writing to a request for consent for a period of 60 days or who, after examination of his or her written reasons for withholding consent, is found by the court to be unreasonably withholding consent.
(Emphasis supplied).
In reconciling the apparent tension between HRS’s authority to select adoptive parents and the trial court’s jurisdiction over adoption proceedings, we are guided by the principles of statutory construction:
When courts are required to interpret statutory language, “a statute should be construed and applied so as to give effect to the evident legislative intent, regardless of whether such construction varies from the statute’s literal meaning.” Nevertheless, that intent is determined primarily from the language of the statute. “When the language of a statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute itself must be given its plain and obvious meaning.” (citations omitted).
Arthur Young & Co. v. Mariner Corp., 630 So.2d 1199, 1202 (Fla. 4th DCA1994).
The trial court here construed Chapter 63, specifically subsection 63.072(4), in isolation when it should be read in context. Arthur Young, 630 So.2d at 1202. Under the basic tenents of statutory construction, section 63.072 must be read in harmony with interlocking statutes. Id. In addition, another principle of statutory construction is that a specific statute covering a particular subject area controls over a statute covering the same and other subjects in more general terms. See McKendry v. State, 641 So.2d 45, 46 (Fla.1994). The more specific statute is considered to be an exception to the general terms of the more general statute. Id.
Chapter 39 specifically controls the placement for adoption of children where parental rights have been previously terminated. While Chapter 63 authorizes the trial court to finalize the adoption, its provisions are triggered only after HRS places and approves a child for adoption as provided in Chapter 39. Thus, we conclude that the general grant of authority over all adoption proceedings does not supersede HRS’s specific authority to select the adoptive parents.
Moreover, even if we focus on the provisions of Chapter 63 relied on by the trial court, these provisions did not permit the trial court to waive HRS’s consent to adoption as it did in this ease. Section 63.062 addresses the consents required before a child may be legally adopted. Regarding children committed to HRS custody, subsection (4) specifically provides:
If parental rights to the minor have previously been terminated, a licensed child-placing agency or the department with whom the child has been placed for subsequent adoption may provide consent to the adoption. In that case no other consent is required.
(Emphasis supplied). Thus, according to the explicit statutory language, if HRS gives its consent, no other consent is required. See Stefanos, 673 So.2d at 13. This is consistent with subsection 39.47(1) which provides that for children in HRS custody, HRS’s consent to an adoption “alone shall in all cases be sufficient.”
Only if we conclude that the term “legal guardian” as used within subsection 63.072(4) includes HRS would the trial court be correct that, read in isolation, subsection 63.072(4) provides authority to waive HRS’s consent. However, we do not “construe statutory phrases in isolation; we read statutes as a whole.” See Arthur Young, 630 So.2d at 1202 n. 4 (quoting United States v. Morton, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984)). Section 63.072 refers to the “following individuals” whose consent may be excused by the trial court and obvi *269 ously HRS is not an individual. Also, although HRS is technically the legal guardian of the child, see §§ 39.47(3), 63.052, Fla.Stat., throughout Chapter 63 the term “department” is used to reference HRS and HRS is specifically referred to in that manner in section 63.062, the preceding section of the statute. See also §§ 63.032, 63.052(1), 63.082. A more reasonable and logical construction of subsection 63.072(4) in the context of the specific provision, the statute as a whole, and interlocking statutes is that it does not apply to HRS whose obligations are controlled by Chapter 39.
While the trial court may have authority in its continuing supervisory jurisdiction under subsection 39.47(4) to compel HRS to make a selection of an adoptive parent if HRS has not acted expeditiously or to disapprove an inappropriate selection, we hold that subsection 63.072(4) does not authorize a trial court to waive HRS’s consent and, thus, override Chapter 39. While Chapter 63 sets forth the procedures to be followed in all cases of adoption, it applies in cases involving children in the custody of HRS only after HRS, pursuant to the authority granted to it in Chapter 39, has selected an adoptive placement.
Although the trial court viewed its authority solely in terms of Chapter 63, to accept the trial court’s reasoning would effectively circumvent the clear statutory framework of Chapter 39 which grants HRS sole authority to select adoptive parents for children committed to its custody.[10] Since any adult can file a petition for adoption, see § 63.042(2), Fla.Stat., the trial court’s reasoning, if followed, would permit anyone to adopt a child in the custody of HRS and then give the trial court authority under section 63.072 to excuse HRS’s consent.
To the extent that subsection 63.072(4) could be interpreted to apply to HRS, we farther hold that consent could not be considered unreasonably withheld within the context of that subsection where, as in this case, HRS has expeditiously selected an appropriate adoptive family and the delay has not been occasioned by HRS. The subsection empowers the trial court to excuse the consent of a legal guardian where there has been no written response to a request for consent or the written reasons given are found to be unreasonable. Neither proviso applies here.
It was only because the trial court entered a temporary injunction in December 1993 that HRS was prevented from removing S.D.V-H. from the custody of the foster parents and placing her in the custody of the biological relatives. Presumably at that point in time the decision of HRS to select the biological relatives as adoptive parents and thus withhold its consent from the foster parents would have been reasonable.
The only reason cited by the trial court for its decision to grant the foster parents’ adoption petition was the stress to the child which would occur if the child was now transferred to the custody of the biological relatives. To approve of this decision would be to- legally endorse the notion that he who gets the child first, gets the child. It would also encourage individuals having temporary custody of a child to delay the adoption proceedings as long as possible so that the argument could be raised, as it was here, that separation would now cause harm.
As the supreme court noted under different circumstances in In re Adoption of Doe, 543 So.2d 741, 744 (Fla.1984), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (Fla.1989), we must be careful not to adopt a rule that “physical custody, because of substantial bonding, is determinative in contested adoptions.” Id. at 744. The danger in measuring the child’s “best interests” by the degree of bonding would make a tentative placement “effectively unre-viewable.” Id.
*270 The trial court additionally erred in failing to dissolve the temporary injunction once the trial court determined that HRS was not equitably estopped in its selection of the biological relatives by any prior representations made to the foster parents. The continuation of the temporary injunction interfered with HRS’s selection of the biological relatives as adoptive parents.
The trial court’s failure to dissolve the temporary injunction preventing HRS from removing S.D.V-H. from foster care and the delay in resolving this matter also resulted in a departure from the expressed legislative policy that a child should not remain in temporary foster care placement for more than a year. “It is the intent of the Legislature that permanent placement with the biological or adoptive family be achieved as soon as possible for every child in foster care and that no child remain in foster care for more than 1 year.” § 39.45(2), Fla.Stat.
Of course, the trial court must act in the child’s best interests in adoption proceedings. See § 63.022(1), (2), Fla.Stat. But that general statement of policy cannot supersede the specific statutory limitations on the trial court’s authority to interfere with HRS’s selection. The trial court does not have discretion to make a different selection simply because the foster parents filed an adoption petition. The trial court was not vested in this case with authority to make a de novo selection. See In re Adoption of M.A.H., 411 So.2d 1380 (Fla. 4th DCA 1982).
The courts are charged with monitoring the progress toward permanent adoptive placement to make sure that such placement occurs as expeditiously as possible. The longer the parties and the courts wait before finalizing an adoption decision, the more difficult the separation.
As recognized by the fifth district, “the passage of time required by these proceedings is harmful to everyone. As children grow older, bonding occurs and new directions are difficult.” Rivera-Berrios v. Stefanos, 649 So.2d 881, 882 (Fla. 5th DCA 1994), quashed on other grounds, 673 So.2d 12 (Fla.1996). We urge the adoption of strict time standards for expedited hearings and appeals in these matters at both the trial and appellate levels.[11]
Although we have expedited review of this matter (the final brief was not filed until March 4, 1996, and Oral Argument was held on March 25, 1996), we nevertheless are now deciding the fate of a child who is over three years old. We recognize that our reversal will result in S.D.V-H.’s separation from the only family she has known since birth—her foster parents. We understand that the foster parents love this young child very much and have provided her with loving and nurturing care. We also recognize, however, that both psychologists who testified agreed that the transition from one loving home to another could be made with a minimum of harm if both families cooperate fully and work together. We urge the foster parents and the biological relatives to do this.
The result in this case comports with common sense as well as public policy. The foster parents should be encouraged to comply with the terms of their agreement with HRS.[12] HRS must be able to rely on these written agreements when it places children in foster care on a temporary basis. Foster parents should not resort to the courts to interfere with HRS’s selection process and circumvent the administrative procedures available to them.[13]
In accordance with our decision, we reverse the final judgment of adoption and remand for proceedings consistent with this opinion which will allow the biological relatives to proceed to finalize their adoption in New York State. We direct the trial court to *271 dissolve the temporary injunction which has been in effect since December 1993, and we further direct all parties to cooperate with one another so that the best interests of this young child are truly served forthwith and without further delay.
While we do not encourage a motion for rehearing, any motion for rehearing shall be filed within three (3) days and any response within two (2) days thereafter.
GUNTHER, C.J., and STEVENSON, J., concur.

. In April of 1994, the natural mother moved to set aside her consent upon which the termination of parental rights was based. Judge Oftedal denied the natural mother’s motion and this court per curiam affirmed that decision.

.Unless stated otherwise, all references to the Florida Statutes are to the 1993 statutes.

.By filing this action in circuit court, the foster parents ignored the administrative procedures available within HRS for review of decisions relating to the suitability of adoptive applicants. See Fla.Admin.Code R. 10M-8.002(e)-(f). Any decision reached through administrative review would then have been subject to a deferential standard of judicial review pursuant to section 120.57, Florida Statutes. See Fla.Admin.Code R. 10M-8.002(f).

. A succession of circuit judges was involved with this minor child at various periods of time. Although part of the reason for this lack of continuity is that petitions for termination are filed in the juvenile court and adoptions in the family division of the circuit court, the lack of continuity is also attributable to changes in judicial assignments within the divisions over a two-year period of time. Not only was there a lack of continuity, but it does not appear that any of the attorneys representing the interested parties alerted the judges to the urgency of making an expedited ruling. While we recognize that no one litigant, lawyer or judge is alone responsible for the delay, every month that went by increased the potential for psychological harm to S.D.V-H. attendant to a separation from her foster parents.

. Judge Cook indicated that because this was an emerging area of the law, he was not going to grant any motions to dismiss; that he would hear the entire case; preserve all appellate issues; and try all issues so that the appellate court would be able to resolve the case without further trial proceedings.

. We do not address whether there are HRS regulations and statutory preferences favoring the biological relatives because we are not reviewing a determination of which couple is the more appropriate choice as adoptive parents. Certainly there are references to the preference for biological relatives in placement decisions in the regulations, see, e.g., Fla.Admin.Code R. 10M-8002(5), and an implicit recognition of this preference statutorily. At the same time, there are regulations that recognize in general the advantage of stability which results from a child remaining with foster parents. See, e.g., Fla.Admin.Code R. 10M-8.002(7)(a), (8)(c).

. This language is now found in subsection 39.41(6), Florida Statutes (1995).

. This subsection and subsection 39.453(l)(c) were amended in 1994 to eliminate the language that "such jurisdiction does not include the exercise of any power or influence by the court over the selection of the adoptive parent.” The amended language provides that "[a]s part of its continuing jurisdiction, for good cause shown by the guardian ad litem for the child, the court may review the appropriateness of the adoptive placement of the child.” The guardian ad litem filed a motion to review the appropriateness of HRS’s selection which the trial court denied. The trial court determined that this language, which affected substantive rights, should not be given retroactive application. Neither party on appeal has contested that determination. Even if this subsection applied to the adoption proceedings, we do not construe it as authorizing the trial court to make a selection of adoptive parents.

. See supra note 8.

. To allow the adoption here is also contrary to subsection 63.212(l)(c), Florida Statutes (1995), which provides that "it is unlawful for any person except [HRS], an agency, or any intermediary to place or attempt to place within the state, the child for adoption unless the child is placed with a relative within the third degree or with a step-parent.” See also § 63.207, Fla.Stat. (1993). S.D.V-H. was not placed by HRS for adoption by the foster parents, but only for temporary foster care.

. Consonant with these goals, our court has adopted a policy of automatically expediting cases involving termination of parental rights and adoption proceedings.

. We agree that the existence of the agreement alone does not preclude the foster parents from adopting. See In re Alexander, 206 So.2d 452 (Fla. 2d DCA 1968). Cf. Berhow v. Crow, 423 So.2d 371 (Fla. 1st DCA 1982).

.Florida Administrative Code Rule 10M-8.002(8) provides a vehicle for the foster parents to express their interest in adoption. See also supra note 3.