# SIXTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 6D2025-0304
Lower Tribunal No. 2021-DP-000440

_____

DEPARTMENT OF CHILDREN AND FAMILIES and GUARDIAN AD LITEM,

Appellants/Cross-Appellees,

v.

J.H. and K.H.,

Appellees/Cross-Appellants.

_____

Appeal from the Circuit Court for Polk County.
Torea Spohr, Judge.

August 1, 2025

## ON MOTION FOR REHEARING

TRAVER, C.J.

On consideration of the motion for en banc review and rehearing filed by J.H. and K.H. ("Denied Applicants"), the Court grants the motion in part, withdraws our prior opinion, and substitutes the following opinion. The motion for en banc review is denied, and this Court will entertain no further motions for rehearing. The Clerk shall issue a mandate contemporaneously with this amended opinion.

Following the termination of his biological parents' rights, two families petitioned to adopt D.A.I.W., Jr. (DOB 10/5/2021) ("the Child"), who was in the custody of the Department of Children and Families ("DCF"). After an administrative hearing conducted by a committee of five adoption specialists, DCF approved the committee's unanimous recommendation and selected A.F. and M.K. ("Foster Parents"), who had raised the Child since six days after his birth, to adopt him. Denied Applicants, the adoptive parents of the Child's half-sisters, asked the trial court to review DCF's denial of their application and to allow them to adopt the Child.

A newly enacted statute constrained the trial court's scope of review. *See* § 39.812(4), Fla. Stat. (2024). It confined the trial court's evaluation of DCF's adoption decision to "whether [its] denial of the application is consistent with its policies and if [it] made the decision in an expeditious manner." *Id*. § 39.812(4)(b)4. It required the trial court to review DCF's denial of Denied Applicants' application for an abuse of discretion. *Id*.

After a two-day evidentiary hearing, the trial court determined DCF had "wronged" Denied Applicants by failing to follow its policies and to act expeditiously throughout the entire case. The trial court thus granted Denied Applicants permission to adopt the Child and to establish a transition plan to remove the Child from Foster Parents and place him permanently in Denied Applicants' care.

2

DCF and the Guardian ad Litem ("GAL") appeal the trial court's final order, over which we have jurisdiction. *See* Fla. R. App. P. 9.030(b)(1)(A), 9.146(b). We granted DCF and GAL's motion to stay the trial court's order and to suspend the Child's transition plan. We now reverse for entry of an order denying Denied Applicants' motion for review.[1] The trial court erred by misapplying the operative statute when it considered matters unrelated to the adoption process, miscalculated the relevant timeline, and applied the wrong standard of review.

We first summarize the background of this case. While this requires a brief review of its entire history, we—like the operative statute—focus on DCF's adoption decision. This period started in May 2024, when Denied Applicants finalized their adoption application, and concluded in November 2024, when DCF denied it. We describe the statutory and regulatory requirements that governed DCF's actions and how DCF complied with those laws and rules here. Second, we recap the review process and the order on appeal. Third, we outline our standard of review. Finally, we analyze the trial court's three interpretive errors in applying the statute.

## I.

The Child was born dependent on methamphetamines. He inherited this dependency from his biological mother, a methamphetamine addict. Six days after the Child's birth, DCF sheltered him. This was not his biological mother's first encounter with the

---

[1] We affirm Denied Applicants' cross-appeal without further discussion.

dependency system. DCF had previously terminated her parental rights over the Child's three older siblings. An older brother moved out of Florida with his father. Denied Applicants fostered and then adopted the Child's two older sisters.

When Denied Applicants learned the Child's biological mother was pregnant, they told DCF, through its community-based care provider ("CBC"),[2] that they wished to foster their adopted daughters' younger sibling. But DCF made a life-altering mistake. When it filed its sworn shelter petition, its child protective investigator noted in his probable cause statement that the Child had three older siblings. But in the section attesting that DCF had made reasonable efforts to keep siblings together and allow for visitation, the investigator said the Child had no siblings. The trial court[3] did not notice DCF's mistake, and it placed the Child with Foster Parents. This violated operative statutes and regulations, which likely would have resulted in the Child's placement with Denied Applicants and his siblings. *See* § 39.4021(2)(a)3., 6., Fla. Stat. (2021) (requiring DCF to consider adoptive parents of child's sibling, when aware of that sibling, before foster placement where child's siblings do not live); Fla. Admin. Code R. 65C-16.002(3)(e) (2021) ("If [DCF] takes into custody a child who is a sibling of a previously adopted child(ren), [DCF], CBC or subcontractor staff shall advise the adoptive parents of this occurrence at the time of removal.").

---

[2] A community-based care provider contracts with DCF to provide care for local children and families involved in the child protection and child welfare system. *See* § 409.986(3)(d), Fla. Stat. (2021).

[3] This was not the same judge who entered the order on appeal.

About three months after DCF sheltered the Child with Foster Parents, Denied Applicants learned of his birth. Foster Parents and Denied Applicants coordinated a visit without DCF's or GAL's help, and it went well. But when Denied Applicants and Foster Parents could not easily coordinate a follow-up visit, Foster Parents asked DCF for help. DCF, through its CBC, told Foster Parents not to worry about it, and eighteen months elapsed before Denied Applicants saw the Child again. GAL never advocated for sibling visitation over that time.

All the while, the Child thrived, hitting all his milestones and growing up in a loving household that had successfully managed his initial medical challenges stemming from the biological mother's drug addiction. Foster Parents adopted another boy, and the two bonded as brothers. The Child began calling Foster Parents "mom" and "dad."

Meanwhile, DCF had initially offered the biological mother a case plan, and the trial court approved a reunification goal. And while the biological mother complied with some basic tasks in her plan, it soon became clear reunification would not occur. DCF also determined the Child's biological father was not the man listed on the Child's birth certificate. After DCF identified the biological father, it petitioned to terminate his and the biological mother's parental rights. This occurred just shy of the Child's second birthday. The Child's biological father consented to termination, and his biological mother failed to show up to pretrial or trial.

At the end of February 2024, the trial court terminated the biological parents' rights. And when neither appealed, the Child became available for adoption in the beginning of April 2024. About that time, Denied Applicants moved to modify the Child's placement to their home.

The adoption application process began in mid-May 2024, when Denied Applicants finalized their adoption application. It concluded in early November 2024, when DCF denied the application. DCF regulations governed this process. *See* Fla. Admin. Code R. 65C-16.001–.009 (2024). Because the operative statute requires DCF to act in an "expeditious manner," we focus on the process's timing in addition to its content. § 39.812(4)(b)4.

The trial court ordered sibling visitation supervised by DCF, but it did not allow Denied Applicants to interact with the Child. Foster Parents would later acknowledge they felt "animosity" towards Denied Applicants when they learned they were also trying to adopt the Child. Although the sibling visits mostly occurred without incident, DCF sometimes observed issues between Denied Applicants and Foster Parents. One Foster Parent yelled at Denied Applicants and their lawyer following a May 2024 court hearing, which led to a bailiff escorting him out of the building.

Following Denied Applicants' submission of their adoption petition, DCF conducted a mandatory home study visit, which occurred at the end of June 2024. *See* Fla. Admin. Code R. 65C-16.002(2)(c) (2024). DCF completed the home study at the end of July and

6

approved it at the beginning of August. It also completed a mandatory child study, which included the Child's developmental history, medical history, family history, physical examination, and educational history. *See id.* R. 65C-16.002(7). It further conducted and approved Foster Parents' home study around this time. *See id.* R. 65C-16.002(2)(b).

The Adoption Applicant Review Committee ("AARC") convened at the end of July and met at the end of August. The AARC consists of at least five people who have completed DCF's adoption competency training. *Id.* R. 65C-16.005(9)(a). It must participate in "situations which present challenging issues, such as when multiple families apply to adopt the same child." *Id.* R. 65C-16.001(8); *see id.* 65C-16.005(9)(b)1. DCF's regulations require it to convene the AARC within fifteen days of a request, which can be made by an adoption counselor, the community-based care provider, or DCF itself. *Id.* R. 65C-16.005(9)(c). Both the AARC and DCF must consider a child's best interests in assessing competing adoption applications before it.[4] *Id.* R. 65C-16.002(2), (5).

Before it met, the AARC reviewed the adoption home studies, the adoption applications, and the child study. It also assessed case notes, background checks, and correspondence from a licensed mental health counselor who observed visits between the Child and his sisters. It additionally analyzed everything the Denied Applicants sent it to

---

[4] Effective June 10, 2025, rule 65C-16.002(2) changed, such that the general reference to a child's best interest only relates to pre-adoptive placements. A specific description of the child's best interests in adoption proceedings took its place. *See* Fla. Admin. Code R. 65C-16.002(5) (2025) (citing § 39.01375, Fla. Stat. (2024)).

review. This included a lengthy spreadsheet that detailed Denied Applicants' years-long efforts to foster and adopt the Child and included information about every scheduled sibling visit. Denied Applicants also provided text message communications with Foster Parents and pictures and videos of the visitations.

Denied Applicants attended the AARC's meeting, where they both acknowledged they could "freely address" the committee. They spoke about their historical challenges with the case, events that occurred at sibling visits, and one Foster Parent's aggressive behavior. They expressed concern that Foster Parents would terminate sibling visitation if they were allowed to adopt the Child, and that this would traumatize the Child's sisters. They spoke about their ability to raise the Child in a loving and safe environment. The AARC asked one Denied Applicant a few clarifying questions; it did not allow Denied Applicants to play the videos they had already submitted.

Sometime after this meeting, the AARC recommended to DCF in writing that it deny Denied Applicants' adoption application and grant Foster Parents' application.[5] Before this occurred, the AARC sent the recommendation to the CBC, who ensured that it included all necessary documentation. In making its recommendation, the AARC considered four

---

[5] The AARC must make a written recommendation to DCF and the CBC within ten days of its decision, but there is no statutory or regulatory deadline by which the AARC must make its decision. Fla. Admin. Code R. 65C-16.005(9)(c).

factors[6] in determining the Child's best interest and resolving the competing adoption applications. *See id.* R. 65C-16.002(5)(a)–(b), (d)–(e). DCF also considered these factors in making its ultimate decision. *Id.* These included attachment, siblings, permanence, and post communication or contact. *Id.*

"Attachment" required the AARC to consider: 1) "the quality and length of the attachment" between the Child and Foster Parents; 2) the Child's age at placement and the Child's current age; 3) how easily the Child attached to Foster Parents and any history of attachment difficulty; and 4) the number of moves and caregivers the Child had experienced. *Id.* R. 65C-16.002(5)(a).

"Siblings" required "[c]onsideration . . . to whether the [applicant] is willing to adopt all members of a sibling group or whether the [applicant] is willing to promote sibling relationships when adoption of all members of the sibling group is not feasible." *Id.* R. 65C-16.002(5)(b).

"Permanence" involved: 1) "[t]he capacity and willingness of the [applicant] to access needed services and meet the [C]hild's need for permanence"; 2) the applicant's ability to understand adoptive children's needs at different developmental stages; and 3) the applicant's awareness "of the inherent challenges of parenting an adopted child." *Id.* R. 65C-16.002(5)(d).

---

[6] The parties agree that the Division of Administrative Hearings repealed a fifth factor related to kinship before the AARC convened, and nobody addressed this factor below or on appeal.

9

"Post communication or contact" explored whether an applicant was willing and able to: 1) "[e]stablish or promote the [C]hild's relationship with [his] siblings, when appropriate"; and 2) agree to post-adoption communication with the Child's siblings when in the Child's best interests. *Id.* R. 65C-16.002(5)(e).

Two AARC members would later offer unrebutted testimony that they weighed all these factors equally and totally, with no factor more or less important than another. After engaging in this process, the AARC recommended denial of Denied Applicants' application. The members testified that the Child's attachment to Foster Parents drove this recommendation.

At the beginning of November 2024, 176 days after Denied Applicants finalized their adoption application and 75 days after the AARC met, DCF denied the application.[7] It based its decision upon evidence presented to the AARC. DCF recited how the Child entered the dependency system. It incorrectly noted that the Child visited his sisters regularly until the termination of his parents' parental rights. It remarked on his "deep attachment" to Foster Parents and his younger brother.

DCF concluded that in weighing the four factors to determine the Child's best interests, the attachment and permanence factors favored Foster Parents. It declared that Foster Parents were the only parents the Child knew, and that Foster Parents were attached

---

[7] There is no statutory or regulatory timeframe governing when DCF must make its decision.

to him and loved him very much. It noted that the Child was also "very attached to the other child in the home, and they have a sibling-like attachment [and] bond." DCF concluded that the Child had "no parent-child relationship" with Denied Applicants because of "minimal contact during sibling visits."

As to permanence, DCF concluded that Foster Parents were more aware of the Child's needs because they had always fulfilled them. It found that the Child got one-on-one attention from Foster Parents, one of whom stayed at home full-time to care for him. It contrasted Denied Applicants, who had never cared for the Child, and who had seven other children under the age of ten.

DCF referenced "other factors" in the operative regulation that "must be considered," but it did not specifically mention "siblings" or "post communication or contact." Fla. Admin. Code R. 65C-16.002(5)(b), (e). It noted that the AARC's denial recommendation was unanimous.

## II.

Denied Applicants timely moved to review DCF's denial with the trial court. *See* § 39.812(4)(b)2. ("A denied applicant may file a motion to have the court review [DCF's] denial within 30 business days after the issuance of [DCF's] written notification of its decision to deny the application to adopt a child."). And the trial court promptly set a hearing. *See id.* § 39.812(4)(b)4. ("The court shall hold a hearing within 30 business days after the denied applicant files the motion to review.").

Denied Applicants' motion for review argued that DCF improperly weighed the AARC's evidence on permanency, siblings, and post communication or contact. It highlighted DCF's error in stating that the Child had regular visitation with his sisters throughout the dependency case. It criticized the AARC for having no bonding experts on it. It argued that DCF's denial letter improperly elevated attachment and permanence over the other two factors, and that it should have recited findings for all four factors.

The trial court conducted a two-day evidentiary hearing in the last week of December 2024. Denied Applicants called eight witnesses and introduced multiple exhibits. DCF called one Foster Parent. Although Denied Applicants introduced DCF's denial letter without objection, nobody called the letter's author or anyone who could explain its drafting process. Two AARC members and Denied Applicants testified. Following the hearing, the trial court ordered written closing arguments, and it belatedly issued a decision at the beginning of February 2025. *See* § 39.812(4)(b)6. (requiring trial court to enter written order on motion for review within fifteen business days after hearing's conclusion).

The trial court granted Denied Applicants' motion for review, and it allowed them to petition to adopt the Child without DCF's approval. In support, it quoted the operative statute, but it also characterized its task as evaluating "whether [DCF's] denial is lawful, correct, and just." It found "competent, substantial evidence" that DCF failed to follow its own procedures or act expeditiously. It concluded that DCF had "wronged" Denied Applicants, either through "actual malice or complete incompetence."

12

In support of this decision, the trial court reviewed and relied on the complete history between the parties, including matters that predated the Child's birth. It criticized DCF for failing to pursue an expedited termination petition and offering the biological mother a case plan. It wondered why it took over a year to identify and adjudicate the Child's biological father and appoint him counsel, and it accused DCF of "dragg[ing] [its] feet" during this process. It questioned DCF's diligence in filing and litigating the biological parents' termination of parental rights petition to conclusion.

The trial court excoriated DCF for failing to identify Denied Applicants as a proper placement following the Child's birth and recognize Denied Applicants' continued efforts to foster the Child. It noted DCF's failure to facilitate any sibling visitation before the trial court terminated the biological parents' parental rights.

The trial court observed that DCF had not acted any more expeditiously in the adoption process than it did throughout the litigation that preceded it. It noted that DCF had "no more than 44 days to complete an adoption home study and make a decision on an adoption application." It calculated 251 days between the entry of the termination of parental rights judgment and DCF's denial letter.

It criticized the AARC's recommendation as "rather arbitrary," noting that even though Denied Applicants received "glowing" reviews, every AARC member "defaulted" to prioritization of the attachment factor. The trial court concluded that DCF, the CBC, and the case management organization "intentionally and purposefully crippled [Denied

13

Applicants] in this process then sought to use it against them as the only cited reason that [the Child] could not be placed with them."

The trial court noted that DCF's rejection letter found attachment "to be an overarching and fundamental factor, practically ignoring all the other factors." It blamed the AARC, DCF, and Foster Parents for failing to allow Denied Applicants to develop any relationship with the Child. It emphasized that the sibling and post communication or contact factors, both missing from DCF's denial letter, heavily favored Denied Applicants. It counted the number of times "sibling" appeared in rule 65C-16.002 and compared it to the number of times it referenced "attachment" and concluded that this supported the factor's greater importance.

By contrast, the trial court concluded that the AARC and DCF gave too much weight to the attachment factor. It credited one Denied Applicant's hearing testimony that the Child could bond with Denied Applicants without suffering harm or trauma. It concluded that it was in the Child's best interests to grow up with his sisters. The trial court summarized its basis for granting Denied Applicants' motion by again laying blame at DCF's feet:

> The [c]ourt finds that from the date of shelter through the adoption process, [DCF] failed to follow appropriate law, rules and procedures and sited [sic] no justifiable reason for the departure. [DCF] failed to immediately conduct family findings, failed to attempt to place the [C]hild with siblings, failed to ensure continued sibling contact, thwarted visitation with a potential adoptive placement, encouraged animosity by forbidding [Denied Applicants] from attempting to have sibling

14

visits and missed important deadlines causing this case to linger in the system long after the statute contemplates permanency. By failing to follow procedure and failing to act expeditiously, [DCF] has wronged [Denied Applicants]. [Denied Applicants'] continued passion and efforts indicate that they have nothing but the best interest of [the Child] in mind and the [c]ourt has no doubt that [Denied Applicants'] family home is a stable and nurturing environment where [the Child] can thrive.

DCF's and GAL's timely appeal followed.

III.

The parties dispute our standard of review. Denied Applicants argue that we should apply an abuse of discretion standard to the trial court's decision. DCF and GAL advocate for de novo review because we evaluate whether the trial court properly interpreted section 39.812(4). We agree with DCF and GAL that we afford a trial court no deference in interpreting a statute. This review is de novo. *See B.Y. v. Dep't of Child. & Fams.*, 887 So. 2d 1253, 1257 (Fla. 2004) (citing *State v. Burris*, 875 So. 2d 408, 410 (Fla. 2004)); *Orosco v. Rodriguez*, 376 So. 3d 92, 94 (Fla. 6th DCA 2023) (citing *McGovern v. Clark*, 298 So. 3d 1244, 1248 (Fla. 5th DCA 2020)). But the statute contemplates that denied applicants will present evidence for the trial court's consideration. *See* § 39.812(4)(b)3. To the extent that the trial court made findings based on relevant and admissible evidence, we will afford these determinations deference by applying a competent, substantial evidence standard. *See Dep't of Child. & Fams. v. A.R.*, 253 So. 3d 1158, 1164 (Fla. 3d DCA 2018).

IV.

The operative statute strictly limits a trial court's evaluation of a denied applicant's motion for review to two questions. *See* § 39.812(4)(b)4. First, was DCF's "denial of the application . . . consistent with its policies?" *Id.* Second, did DCF deny the application "in an expeditious manner?" *Id.* The statute limits a trial court's review of a DCF denial to an abuse of discretion. *Id.*

In applying our mixed standard of review, we conclude the trial court erred in three ways. First, in considering whether DCF's denial of Denied Applicants' petition was consistent with its policies, the trial court based its decision on irrelevant information. The only relevant information compelled a contrary conclusion. Second, it compounded this error by evaluating an improper time frame in concluding DCF did not make its adoption decision in an expeditious manner. It based this incorrect conclusion on a basic factual misunderstanding of the record before it. Third, it applied the wrong standard of review. Rather than affording DCF discretion in its adoption decision, the trial court engaged in a de novo review that reweighed the evidence and sought to remedy past DCF shortcomings by deciding in Denied Applicants' favor.

When interpreting a statute, we follow the supremacy-of-the-text principle. *Pradaxay v. Kendrick*, 387 So. 3d 437, 439 (Fla. 6th DCA 2024) (citing *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 946 (Fla. 2020)). "This principle dictates that '[t]he words of a governing text are of paramount concern, and what they convey, in their

16

context, is what the text means.'" *Id.* at 439–40 (quoting *Ham*, 308 So. 3d at 946). "[W]e must consider these words in context, 'exhaust[ing] all the textual and structural clues that bear on the meaning of a disputed text.'" *Id.* at 440 (quoting *Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022) (internal quotation marks omitted)).

## A.

The operative statute's reference to DCF's "policies" relates, in context, to DCF's policies surrounding the denial of an adoption petition. *See* § 39.812(4)(b)4. ("The court may only consider whether [DCF's] denial of the application is consistent with its policies . . . .").[8] Thus, the trial court erred by basing its decision on DCF's failure to follow its

---

[8] Denied Applicants contend that we should rely on the prior construction canon to import judicially created definitions for "policies" and "expeditious" into our evaluation of these statutory terms. *See C.S. v. S.H.*, 671 So. 2d 260, 262 (Fla. 4th DCA 1996). "The prior construction canon teaches that, 'when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.'" *Fla. Highway Patrol v. Jackson*, 288 So. 3d 1179, 1182–83 (Fla. 2020) (quoting *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008)); *see also Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("Our conclusion rests on a longstanding interpretive principle: When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" (quoting *Hall v. Hall*, 584 U.S. 59, 73 (2018))).

Some statutory history contextualizes this unpersuasive argument. In 2024, the Florida Legislature amended section 39.812(4) to clarify a trial court's "continuing jurisdiction" over children placed in DCF's custody pending adoption. Previous statutory versions had placed contested adoption decisions in DCF's hands. *See* § 39.47(1), (4), Fla. Stat. (1993) (stating DCF's consent to adoption "alone shall in all cases be sufficient" and that trial court's jurisdiction "does not include the exercise of any power or influence . . . over the selection of an adoptive parent"). The Florida Legislature amended the law in 1994 to allow GAL to seek review of a DCF adoption decision with which it disagreed for "good cause." § 39.47(4), Fla. Stat. (1994). Parties denied the ability to adopt would later challenge denials of motions for review directly via an administrative proceeding. *See,*

policies before the adoption process commenced. To validate the trial court's interpretation of this statutory provision, we would have to alter the statute's text by adding language authorizing review of DCF's actions outside the adoption application process. We cannot do this. *See Iselin v. United States*, 270 U.S. 245, 251 (1926) ("To supply omissions [to a statute] transcends the judicial function."). The parties do not meaningfully dispute this construction; they focus their briefing on the "policies" outlined in rule 65C-16.002.

But the trial court considered events that occurred before DCF filed the Child's dependency case, including Denied Applicants' request to foster the biological mother's child during her pregnancy. It based its denial on DCF's failure to identify Denied Applicants as a proper initial placement upon removal. It also weighed DCF's refusal to file an expedited termination of parental rights proceeding, "dragg[ing] its feet" on determining the identity of the Child's biological father, and the speed with which it prosecuted its eventual termination petition.

Meanwhile, the record shows DCF followed its policies after the adoption process commenced. Although Denied Applicants had the burden to show DCF "unreasonably

---

*e.g.*, *Dep't of Child. & Fams. v. I.B.*, 891 So. 2d 1168, 1170 (Fla. 1st DCA 2005). Trial courts retained continuing jurisdiction to review whether DCF's adoption decision was "appropriate, consonant with its policies and made in an expeditious manner." *See C.S.*, 671 So. 2d at 262.

Denied Applicants urge us to apply the prior construction canon to import reasoning of what *C.S.* and its progeny thought "policies" and "expeditious" meant. But that canon does not apply here because those cases did not interpret a statutory provision containing those terms.

18

denied [their] application to adopt," they did not elicit testimony from the denial letter's author. *See* § 39.812(4)(b)2. Instead, two AARC members testified that the committee considered every document it needed to consider, plus every document, picture, and video Denied Applicants provided. Both said they addressed every applicable factor in rule 65C-16.002(5). This included discussion about sibling visitation and post communication or contact. Indeed, one AARC member shared her concern that future sibling visits might not continue if Foster Parents adopted the Child. After weighing all factors, the AARC unanimously concluded that Foster Parents should adopt the Child because he had lived with them since he was six days old, and he was attached to Foster Parents, their son, and their extended family. It determined that it would be traumatic to remove him, and this weighed heavily in its recommendation. Denied Applicants had an unlimited opportunity to address the AARC, and they exercised this right. They outlined every complaint they had with how DCF handled the Child's case and where it placed him. They described their experience in raising sibling groups and argued that the Child could form an attachment with them. They expressed concern for future sibling contact if Foster Parents adopted the Child, and they detailed issues with supervised visitations. They described the Foster Parents' aggressive behavior towards them. The AARC asked one Denied Applicant clarifying questions, and although he criticized them for not asking more, this does not suggest DCF's failure to follow its policies.

DCF relied exclusively on the evidence adduced before the AARC in preparing the denial letter. The letter lacks quality, contains at least one factual error, and excludes any discussion about the sibling or the post communication or contact factors. Still, it states that it considered every factor, and that it relied on the AARC's recommendation. It alerted Denied Applicants to their right to file a motion to review with the trial court and informed them of their deadline. Ultimately, the trial court misapplied the statute's plain language, and in so doing, disregarded unrebutted evidence that DCF's denial of Denied Applicants' application was consistent with its policies. We do not remand for a new determination on this subject because the record does not allow for a contrary conclusion.

### B.

The trial court also erred when it misapplied the operative statute's plain language to determine that DCF did not make "such decision in an expeditious manner." *See* § 39.812(4)(b)4. It focused on an improper time frame. Although it alternatively reviewed the correct period, it then miscalculated that time through several factual and legal errors.

The parties disagree what period the statute references in requiring a decision in an "expeditious manner." *See id.* Denied Applicants claim the trial court correctly found it relates to the entire case; DCF and GAL contend it concerns only the adoption decision. A review of the entire statute illustrates the trial court's error. *See Lab'y Corp. of Am. v. Davis*, 339 So. 3d 318, 324 (Fla. 2022) ("Under the whole-text canon, proper interpretation requires consideration of 'the entire text, in view of its structure and of the physical and

20

logical relation of its many parts.'" (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012))). The operative statute discusses adoptions that follow the disposition of a dependency case. *See generally* § 39.812. The operative section addresses the trial court's continuing jurisdiction "for the purpose of reviewing the status of the child and the progress being made toward permanent adoptive placement." § 39.812(4). The operative subsection concerns review of DCF's decision on the adoption. § 39.812(4)(b). And the operative sub-subsection references both DCF's decision to deny an adoption application and whether DCF made "such decision" expeditiously. § 39.812(4)(b)4. No plausible reading of section 39.812 supports the trial court's decision to assess and criticize DCF's actions at any time before Denied Applicants finalized their adoption application.

The trial court alternatively reasoned that DCF failed to act expeditiously in the post-disposition adoption process, but this conclusion rests on an unsupportable foundation characterized by factual and legal errors. The trial court calculated 251 days from the time it terminated the biological parents' rights until DCF denied Denied Applicants' application and used this as the relevant period to assess expeditiousness. But the Child was unavailable for adoption until 35 days after the final judgment terminating the biological parents' rights, and Denied Applicants did not complete their adoption application until 36 days after that. Thus, the trial court miscalculated the overall process by 71 days. DCF took 180 days, not 251, to make its decision.

21

Further, the trial court addressed only one deadline during this 180-day time frame: DCF's obligation to complete and approve a home study. *See* § 63.092(3), Fla. Stat. (2023) ("If the identified prospective adoptive minor is in the custody of the department, a preliminary home study must be completed within 30 days after it is initiated."); § 63.093(5), Fla. Stat. (2023) ("The [CBC] or its subcontracted agency must approve or deny the home study within 14 business days after receipt of the recommendation."). But a home study is just one component of a contested adoption process.

The trial court's second error was thus overlooking any of the other policies involved in a contested adoption, including the critical role of the AARC and DCF's review of its recommendation. The AARC could not convene until the completion of the home studies and the child study. While the operative regulation compels the AARC to convene within fifteen days of a request and provide a written recommendation within ten business days of the committee's decision, it does not reference a timeline governing when the AARC must conduct its hearing or offer its written recommendation to DCF. *See* Fla. Admin. Code R. 65C-16.005(9)(b)1., (c). Nor does any legal source dictate DCF's deadline to act on this recommendation. The Legislature could have included specified timeframes, even to include hard deadlines for every action in a contested adoption process. But we do not second guess the reasons the Legislature, or the drafters of the administrative code, chose to exclude such timeframes. We recognize that each case is different, some are more complex than others, and a one-size-fits-all timeline is absent from the statute or the rules.

22

Although the statute does not define "expeditious," we can determine its meaning "by considering its plain and ordinary public meaning at the time of enactment." *See Pradaxay*, 387 So. 3d at 440. Again, we consider its use in context, "exhausting all the textual and structural clues that bear on" its meaning. *See id.* (quoting *Conage*, 346 So. 3d at 598). "Typically, the best evidence of what a contested term meant when enacted comes from a dictionary published close to that time." *Id.* (citing *Conage*, 346 So. 3d at 599). "Expeditious" means "[a]cting or done with speed and efficiency." *Expeditious, The American Heritage Dictionary of the English Language* (5th ed. 2022), https://ahdictionary.com/word/search.html?q=expeditious.

Our record shows that DCF could have moved more quickly in starting its home study, which did not begin until five weeks after Denied Applicants finalized their adoption request. Once this process began, though, DCF made a final decision in 138 days. And although "expeditious" means speed in context, it also must factor efficiency in the same context. While the parties may have different thoughts on why this was a difficult decision for DCF to make, nobody claims otherwise. One could easily imagine a quicker decision being criticized as sloppy or preordained.

To be clear, there may be some situations when determination of whether DCF acted expeditiously would require remand for further proceedings on this issue. This is just not one of them. We see no way in which a quicker decision would have affected this case, especially when DCF followed its post-adoption policies.

23

C.

Finally, the trial court disregarded the statute's unambiguous directive to review DCF's decision for an abuse of discretion. *See* § 39.812(4)(b)4. The abuse of discretion standard is highly deferential: an agency only abuses its discretion when its action is arbitrary, fanciful, or unreasonable. *See J.J. v. Dep't of Child. & Fams.*, 376 So. 3d 816, 820 (Fla. 2d DCA 2023) (quoting *A.P. v. Dep't of Child. & Fams.*, 230 So. 3d 3, 6 (Fla. 4th DCA 2017)). The trial court did not apply this standard at all. Instead, it engaged in a de novo review of DCF's decision that not only afforded that decision no weight, but punished DCF for its mistakes and delays before the decision-making process began.

The trial court erred by second-guessing DCF's work in deciding which adoptive placement was better for the Child. It described its job as determining whether DCF's decision was "correct" and "just." In so doing, the trial court labeled the AARC's actions as "arbitrary," noting that despite "glowing" references supporting Denied Applicants, the committee "defaulted" to the attachment factor in making its recommendation. It criticized DCF's reliance on attachment in its denial letter and emphasized that other factors missing from the letter heavily favored Denied Applicants. It concluded that it was in the Child's best interests to grow up with his sisters.

But the trial court did not just second-guess DCF's adoption choice. It challenged the Child's initial placement and DCF's litigation strategy in the ensuing termination of parental rights case as a justification to reverse DCF's separate discretionary decision to

24

deny Denied Applicants' adoption petition. It concluded that DCF had "wronged" Denied Applicants and used this "wrong" to make its decision. Relying on multiple actions and perceived delays that occurred before the adoption process began, the trial court accused DCF of relying on an attachment that only existed because of its error to justify its decision.

The operative statute did not allow the trial court to reweigh evidence in this fashion. Under section 39.812(4)(b)3., Denied Applicants only had standing "to file a motion to review the department's denial and to present evidence in support of such motion." The trial court's task was not to reweigh the evidence or right any wrongs. Its job was to apply the factors contained in section 39.812(4)(b)4., giving deference to DCF's decision, and its failure to do so was error.

V.

For the reasons outlined in this opinion, we reverse the trial court's order granting Denied Applicants' motion for review and uphold DCF's decision to allow Foster Parents to adopt the Child.

AFFIRMED in part; and REVERSED in part.

STARGEL, J., concurs.
BROWNLEE, J., concurs in result only, without opinion.

Stephanie C. Zimmerman, Deputy Director & Statewide Director of Appeals, of Children's Legal Services, Bradenton, for Appellant/Cross-Appellee, Department of Children and Families.

Sara Elizabeth Goldfarb, Statewide Director of Appeals, Sarah Todd Weitz, Senior Attorney, Appellate Division, and Laura J. Lee, Assistant Director of Appeals, of Statewide Guardian ad Litem Office, Tallahassee, for Appellant/Cross-Appellee, Guardian ad Litem.

Katie Jay and Sarah J. Campbell, of Jay & Campbell, PLLC, Stuart, for Appellees/Cross-Appellants.

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING AND DISPOSITION THEREOF IF TIMELY FILED